## UNITED STATES v. HAUPT.
### No. 8607.

Circuit Court of Appeals, Seventh Circuit.
Dec. 20, 1945.

Rehearing Denied Jan. 24, 1946.

MAJOR, Circuit Judge, dissenting.

Hans Max Haupt was convicted of treason, and he appeals.

Paul A. F. Warnholtz and Frederick J. Bertram, both of Chicago, Ill., for appellant.

J. Albert Woll, Richard G. Finn, and Earle C. Hurley, U. S. Atty., all of Chicago, Ill., for appellee.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

EVANS, Circuit Judge.

Hans Max Haupt was tried and convicted on an indictment which charged him with the crime of treason. It was his second trial and his second conviction, on a charge of treason. The death sentence on the first trial was reversed on appeal. 7 Cir., 136 F.2d 661. On this conviction on a second indictment, the trial judge sentenced him to imprisonment for life and to pay a fine of $10,000.

Giving Aid and Comfort to a war enemy, the German Reich, in June, 1942, by harboring and assisting its agent, Herbert Haupt, was the heart of the charge. Herbert was the son of the defendant. Herbert and his comrades came to this country, in June, 1942, in a German submarine, landed on the Florida coast, cached their supplies on the beach, and dispersed to their various assignments. Herbert was later executed pursuant to the judgment of the military tribunal. See Ex Parte Quirin, 317 U.S. 1, 63 S.Ct. 1, 2, 87 L.Ed. 3.

The story of this German war stratagem is quite fully stated in the opinion of this court in 7 Cir., 136 F.2d 661, and more particularly in the decision of the Supreme Court in 317 U.S. 1, 63 S.Ct. 1, 2, 87 L.Ed. 3. See also Cramer v. United States, 325 U.S. 1, 65 S.Ct. 918.

In Ex Parte Quirin, supra, the Supreme Court disposed of a case where the trial by a military commission, of the German saboteurs, who were the members of the expedition of whom Herbert was one, was reviewed. We refer to those opinions for a factual background and thereby avoid repetition. The story is one of great hazard and audacity. The venture had for its objectives the destruction of the aluminum plants in the United States, as well as other vital industries, also our transportation systems. This was to be accomplished through the use of high power explosives, made in German war plants. The participating parties had, for the most part, lived in the United States. They had been thoroughly trained as expert saboteurs to do widespread damage to places, people and plants where such damage would most effectively cripple the United States in the then existing World War. Their devotion to German Naziism was suicidal in its intensity.

In the instant case, there was a lengthy trial before a court and jury. The evidence came from F. B. I. investigators, the fiancee of the son, the jail-mates of the defendant in the County Jail in the summer of 1942, and co-workers and employers of defendant. It also came from co-members in various German associations, particularly from members of the Veterans of the German Army in World War I, of whom defendant was one. Defendant did not take the witness stand. His wife testified, but her testimony was brief and unimportant.

Upon the rendition of the verdict, the trial court made an earnest, sincere statement explanatory of his sentence of life imprisonment instead of death—on the basis of a recommendation of mercy given by the jury in the form of a letter received after verdict.

The usual pleadings in criminal cases were filed by defendant, namely, demurrer to the indictment, motions for directed verdict, for new trial, exceptions to instructions, objections to evidence, etc.

Defendant, Hans Max Haupt, was born in Germany in 1894. His son, Herbert, the

saboteur, was also born in Germany, in 1919. Defendant came to this country in 1923, and his wife and son followed two years later. Defendant, in this country, worked as a painter, decorator and bricklayer by trade. He also worked with his wife as a "couple" in a Chicago suburb. Herbert had worked for the Simpson Optical Company, and was being trained as an optical worker. In the midst of the training, Herbert and Wolfgang Wergin, a friend, took a trip to Mexico, leaving Chicago in June, 1941. Eventually they reached Tokyo, and finally Germany.

In Germany, Herbert attended a school, military in character, devoted to training saboteurs. The soldiers attending were taught the use of explosives, how to place them and to fire them, and to avoid detection, etc., and they were also taught the arts commonly practiced by spies, etc.[1] One of Herbert's classmates and co-actors on this bold and fanatical expedition, Ernest Peter Burger, detailed their training, and what is more important—their mission to this country. He stated that Herbert "*received orders to procure an automobile and put this automobile to the disposal of our group.*" "He also received orders to procure information and details concerning the optical industry in Chicago, especially of the Norden bomb sight, and furnish information which was * * * to equip us to carry out our assignments." The automobile was to be used to transport the explosives from the cache where hidden and to give "range to the operations." Herbert was ordered to go directly to Chicago.

When the schooling and instructions in Germany were completed, the expedition, composed of two units of four men each, was outfitted with explosives and other equipment,[2] with large sums of money,[3] and embarked for the United States on German submarines. One of the submarines, on which Herbert was a passenger, landed in Florida. They went ashore and Herbert participated in burying the equipment in the beach. He then came to Chicago. Herbert received $5,000 which he carried in his money belt and $400 in smaller bills. He was also given a zipper bag of which he was told to take particular care, for it contained $10,000.

Upon arrival in Chicago Herbert went to the home of a relative, and his parents were summoned there by phone. They evidently had no prior notification of his coming and were surprised at seeing him. Herbert related to his parents, his travels from Chicago to Germany, and his mission to this country.[4] Herbert thereafter went to his parents' home where he stayed the week of June 22.[5] His father went with Herbert on two successive evenings to an automobile agency to effect the purchase of a Pontiac car.[6] His father (and mother) also went one evening to the home of one Grunau, and later to the home of one Koch, both foremen at the Simpson Optical Company, where Herbert asked to be reinstated in his former position at that company.[7] It is upon these activities that the overt acts of treason alleged in the indictment, and submitted to the jury, were predicated. Herbert was seized by Government officials on Saturday morning, June 27.

Proof of treason necessitates the testimony of two witnesses to at least one legally sufficient overt act. Treason is a crime defined by the Constitution rather than by statute. The Constitution (Article III, Section 3, clause 1) reads:

"Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act or on Confession in open Court."

Defendant's attack on the validity of the judgment is most vigorously and extensively directed at the overt acts, their sufficiency, their proof and the judge's charge to the jury in respect to them. Numerous other assignments are made and earnestly argued. But the attack on the overt acts

---

[1] They learned how to connect time devices with explosives; tested formula explosives and incendiaries; how to place explosives, undetected, on railroads; learned how to destroy railroad engines and rolling stock; how to paralyze aluminum plants.

[2] 8 boxes of TNT, chemical equipment and fuses and detonators, timing devices. They were also given draft registration cards and social security cards. They received shovels.

[3] Leader of Witness Burger's group was given an emergency fund of $82,000. Herbert's leader had $60,000 in addition.

[4] Testimony of Hamby, Majerczak, Hirsch and Robe.

[5], 6, and 7 will be discussed later in detail.

appears to be the most confidently asserted one and the one most extensively argued. The decision of the majority of the court in the recently decided case of Cramer v. United States, supra, doubtless accounts for defendant's chief and confident reliance for his extended attacks on the overt acts rulings, although some of the other assignments of error would have been quite as impressive with counsel as they are with us, were it not for the ruling in the Cramer case.

We here set forth the various assignments of error which the defendant presents:

1) The acts charged do not constitute the crime of treason.

2) The submitted overt acts were colorless and innocuous and not treasonable in nature.

3) The duplicitous indictment charged many offenses, even of different criminal classification.

4) Denial of motion to quash indictment because of pendency of prior treason indictment, the conviction under which this court reversed and remanded with directions for new trial.

5) Denial of bill of particulars, seeking details of how the son was to be assisted in obtaining employment; and in what manner and by what acts the son was harbored; in what manner the son would be aided in carrying out his mission in purchasing a car.

6) The evidence of statements made up to six years prior to the time of the overt acts, to show intent (much of it pre-war conversations); statements and admissions made while in custody, were inadmissible, not being made in open court; admission of evidence of conversations occurring outside presence of appellant; improper examination and intimidation of witness Zermer; improper for the Government to prove by but one witness overt acts which they knew could not be submitted because not provable by two witnesses; evidence as to withdrawn overt acts should not have been introduced or submitted to jury. Overt acts 1-9, 18, 19, 25-29 were not supported by two witnesses and it was improper to use any evidence relating to any such acts to obtain a conviction upon any overt act submitted to the jury.

7) Court improperly received in evidence highly prejudicial exhibits without requiring that they be first connected up with the defendant.

8) Court improperly refused to receive in evidence copy of Ill.Stat. relating to accessories after the fact, which it is contended is receivable in a Federal trial where not inconsistent with Federal statute or constitution.

9) Court should have directed verdict of not guilty because of insufficiency of evidence to support charge of overt acts submitted; there was error in overruling motion for new trial, also motion in arrest of judgment.

10) Errors occurred in 21 instructions which were given and in refusal to give 15 proffered instructions. In particular the court's charge failed to impress upon the jury the fact that acts done solely to aid his son as an individual did not constitute treasonable action.

11) Error to send to jury the entire indictment containing many prejudicial statements, in particular the unsubmitted overt acts.

12) Error to send to jury room the typewritten copy of instructions thereby accentuating errors therein.

13) Government counsel's argument was prejudicial, inflammatory and appealing to war hysteria.

14) The verdict was the result of war hysteria and misapprehension of the law and facts because of erroneous instructions; the verdict was induced by physical exhaustion of the jury in deliberating 28 hours without sleep; and was the result of the improper reading of the testimony of three witnesses', at the request of the jury, 24 hours after submission of the case to them.

15) The general verdict cannot be sustained, if any specific overt act or its proof were insufficient. There was insufficiency of proof both as to overt acts submitted and overt acts withdrawn. The court cannot say on which of the alleged overt acts the jury found against the defendant.

A study of the entire record leaves us with the impression that the trial was conducted in a manner such as to impart confidence in the fairness and the earnestness of the effort of the court to accord the defendant every right which our laws extend to all, regardless of the nature of the crime charged, or the strength or weakness of the evidence which the accused might offer.

It was no doubt unfortunate that the trial occurred before the decision in Cramer v. United States, supra, and the trial judge did not have the benefit of the discussion which appears in the opinions in that case.

Concededly[8] there must be direct proof, by two witnesses, to each overt act, submitted to a jury, upon whose general verdict the sentence in a treason case is pronounced. There may be overt acts of legal sufficiency and established by the direct testimony of two witnesses, but the conviction will fall if the court submitted to the jury certain alleged overt acts which were charged in the indictment but which were either legally insufficient or not sufficiently established to present a jury question, by the direct testimony of two witnesses. The holding of the court in the Cramer case may make conviction in treason cases difficult. It may in actuality make treason a theoretical crime, a paper crime, but we have no alternative but to follow the law as there announced by the Supreme Court.

True, the prosecution might have withdrawn several of the alleged overt acts charged in the indictment. It did in fact withdraw over half of them. It could have withdrawn more and made its conviction less vulnerable to the many attacks which defendant makes to the evidence, instructions, etc., thereon.

Doubtless counsel for Government believed they were trying a real case, not toying with a theoretical or supposititious one. They were confronted by actualities, not a theory. They were not preparing the facts for an interesting detective story. It was treasonable action with which they were dealing, and the overt acts and the two witness rule provoked a full and complete presentation of the facts, not cautionary action inspired by a fear of error in the charge or the production of evidence. Perhaps a special verdict where the jury would be required to pass on each overt act separately would have helped some. Even then additional questions interrogating the jury as to each overt act found to be established would, we believe, be necessary to avoid the multitude of questions which astute counsel has raised although some of them are not worthy of serious consideration.

Defendant asserts that there are numerous overt acts alleged, and which were submitted to the jury but which had not the testimonial support of two witnesses.

The law being as announced in the Cramer case, it is our duty to carefully examine the long record here involved and determine if the requisite constitutional measure of proof was adduced by the Government. In performing this task, we have, as we read the respective witnesses' testimony, recorded the evidence relevant to any submitted overt act, to the said overt act to which it appertains. Because of the indispensability of such proof on one theory which has been advanced by government counsel, as to each overt act submitted we set forth such evidence and overt acts seriatim.

The indictment charged 29 overt acts. Only 12 were submitted to the jury. The others were withdrawn as overt acts. Generally stated, six of the submitted overt acts charged harboring of the son for six successive days from June 22 to June 27, inclusive; two[9] charged accompanying the son to the respective homes of former employers to secure re-employment; and the remaining four[10] charged accompanying and assisting the son in the purchase of an automobile.

The overt acts submitted to the jury were numbers 10 to 17 and 20 to 23, both inclusive. We therefore begin with overt act No. 10.

### Overt Act No. 10.

"Said Hans Max Haupt, on or about June 22, 1942, accompanied said enemy, Herbert Haupt, to the home of Andreas Conrad Grunau, 6361 Leoti Ave., Chicago, Illinois, for the purpose of assisting the said Herbert Haupt in securing employment so that the said enemy might conceal his identity and mission as an agent of the German Reich and be permitted and enabled to carry out and pursue his said mission."

Concerning this Act No. 10, eight witnesses, including Mr. and Mrs. Grunau, testified. They testified to Mr. and Mrs. Haupt and Herbert leaving the Haupt residence, getting into the Plymouth car, with Herbert driving, but exchanging seats with his father, after a few blocks, and the father driving them to the Grunau home, where they all alighted, met with the Grunau women folk, and entered the Grunau home. Mr. and Mrs. Grunau both

---

[8] In brief filed by Government after oral argument.

[9] Overt acts 10 and 11.

[10] Overt acts, 13, 14, 15, and 16.

testified to Herbert's asking for his position back with the Simpson Optical Co., and Mr. Grunau told Herbert to come down on Thursday to fill in an application. The Grunaus' daughter testified to the visit of the Haupts that evening. The remaining testimony dealt with the Haupts' driving away, after having been at the home for an hour or an hour and a half (Mr. Grunau had come in after the Haupts had arrived). Mr. Haupt drove the car on leaving the Grunau residence. The verbatim testimony in support of this brief fact statement is set forth below.[11]

[11] *Andreas Conrad Grunau,* Government Witness (Superintendent of Simpson Optical Mfg. Co.).

"* * * a short time later he asked me for a job. * * * Q. Who was there when he asked you for the job? A. Myself, Mr. Haupt, my daughter * * * Q. What was said about a job? A. He said he would like to get the job back * * * Q. * * * with whom? A. Simpson Optical Company. * * * A. I told him it might be possible, only he should come down on a Thursday and fill out an application so as he left the company he would have to fill out an application * * *. So I ordered him down—told him to come down Thursday morning to the factory. * * *"

*Josefa Grunau,* Govt. Witness, wife of Andreas Grunau.

"Q. Do you recall anything else that he said at that time? A. Well he hoped to get his job back * * * Q. Who was there? A. My daughter, myself, and Mr. Haupt." "* * * how long did they remain at your home that evening? A. About three quarters of an hour, or an hour * * *."

*Edith McGowan,* Government Witness (Daughter of Grunaus').

"Q. Calling your attention to the evening of June 22, 1942, did the Haupts come out to your home * * * A. Yes, sir. Q. Who came? A. Mr. Haupt and Mrs. Haupt and the son. * * * Q. Do you recollect how they arrived at your house? A. In a car. Q. Do you know who was driving? A. Mr. Haupt."

*Richard W. Axtell,* Government F. B. I. Agent.

"At about 7:30 that night I saw Hans Haupt and Erna Haupt and Herbert Haupt go out of the front door of the Hans Haupt home at 2234 North Fremont. * * * they got into a Plymouth car sedan * * *. Herbert Haupt got into the driver's position of the car and drove the car away * * *. Well, they drove around the block and then the car stopped * * *. I saw Herbert Haupt get out from the driver's position of the car and at the same time Hans Haupt got out of the right side of the car and the two of them changed positions with each— Hans Haupt then taking the driver's seat. * * * They proceeded * * * the car stopped. * * * that was the residence of Andreas Conrad Grunau * * *. As the car pulled up, and as the car stopped the three persons—that is Hans, * * * and Herbert * * * got out of the car and walked up the front sidewalk to the Grunau residence." (They stayed an hour and a half.) "* * * Then I observed Hans Haupt, Herbert Haupt and Erna Haupt coming out of the Grunau residence and they again got into the Plymouth car * * * Hans Haupt * * * was then driving the car * * *."

*John A. Lynch,* F. B. I. Government Agent.

"At 7:45 P. M. I observed Mr. and Mrs. Haupt and Herbert emerge from the residence at 2234 North Fremont Street and enter the * * * automobile and proceed south * * * Herbert Haupt sat behind the wheel. * * * After proceeding * * * he exchanged * * * positions with Mr. Haupt. * * * It * * * proceeded to 6361 North Leoti street. * * * that residence was the residence of Mr. Grunau. * * * approximately 9:30 P. M. Mr. and Mrs. Haupt and Herbert Haupt emerged from the residence * * * and re-entered the * * automobile. * * * At that time Mr. Max Haupt was driving."

*Pennel V. Robe,* F. B. I. Agent.

Tells of the father and mother and son driving from home on 22nd, and father driving, after switching with son. "Mr. and Mrs. Haupt and Herbert Haupt, after arriving at 6361 North Leoti got out of their car * * * Then they entered the house * * *." (This was sometime after 7:30 P. M.) "Q. When did they come out of that place? A. At approximately 9:30 P. M. * * * They entered the Plymouth automobile and drove away from 6361 North Leoti. Q. Who was driving? A. Mr. Haupt."

*Joseph W. Kriofske,* F. B. I. Agent.

"Q. What did Herbert * * * Hans * * * and Erna Haupt do after they came out of that apartment building that day? A. They got into a 1940 Plymouth sedan * * * Herbert drove the car approximately two blocks, at which he stopped the car and changed positions with his father who then proceeded to drive. * * * they went to 6361 North Leoti, arriving there approximately 8:00 P. M. * * * Herbert * * * went up to the front door * * * Q. Who went into the

*Overt Act No. 11.* This charge is:

"Said Hans Max Haupt, on or about June 22, 1942, accompanied the said Herbert Haupt to the home of Heinrich Koch, 7240 N. Odell Ave., Chicago, Illinois, for the purpose of further assisting said enemy in procuring employment, so that he might conceal his identity and mission as an agent of the Government of the German Reich and be permitted and enabled to carry out and pursue his said mission."

The evidence of five witnesses, including Mr. and Mrs. Koch, on this count, disclosed the fact that the Haupts, with the father driving left the Grunau residence and drove to the Koch home, arriving there about 9:30. Mr. Koch is the Shop foreman and supervisor for Simpson Optical Company, under whom Herbert had worked in his prior employment there. Herbert asked for re-employment. The visit lasted about an hour, when the trio emerged, with Hans driving the car, to the Haupt home. The specific evidence in point is set forth below.[12]

*Overt Act No. 12.* Overt Act No. 12 is charged in the indictment in this language:

"Said Hans Max Haupt, on or about June 22, 1942, harbored and sheltered the said enemy Herbert Haupt at the home of Hans Max Haupt and Erna Haupt, 2234 N. Freemont St., Chicago, Illinois, well

house? A. Mr and Mrs. Haupt. * * * They remained in the house until approximately 9:30 P. M."

*James C. Conerty,* F. B. I. Agent.

"Q. On that date (June 22, 1942) about 9:30 P. M., did you go into the neighborhood of 6361 North Leoti Avenue * * *. A. I did. * * * after we arrived we observed three individuals leaving the address at 6361 North Leoti. * * * we observed they were Mr. and Mrs. Haupt and Herbert * * *."

[12] *Heinrich Koch,* Government witness.

He testified he knew Herbert Haupt. Herbert worked under him in his department. Herbert was a lens grinder and polisher. "Q. Calling your attention to the 22nd day of June, 1942, in the evening of that day, did Hans Haupt and Erna Haupt and Herbert Haupt come to your home? A. Yes, sir. Q. Approximately what time was it when they got to your house * * * A. It was about 9:30 * * *" "Mrs. Haupt said 'Herbert is back. I want to show him to you, so you won't be surprised if you see him one morning in the shop * * * then, he said that he wants to start working again in defense work, and he talked quite a while to Mr. Grunau about it, and I told him then, well,—Q. Did he say anything on the subject of getting his job back? A. Yes, he likes to get back his job. Q. Was that at the Simpson Optical Manufacturing Company? * * * yes * * * Well, I told him, 'Well you are in that age, where you will get drafted,' and then Mr. Haupt said, *'I sent him all this morning to the Draft Board and to the FBI.'* * * * And he (Herbert) said 'Well, maybe through my two years' experience as a polisher and lens grinder, I might get deferment.' * * * The only thing I can recall is that Mr. Haupt told—Said that he wants to buy him a car so that he can go to work, because he used Herbert's car all the time and she is in pretty bad shape, and he wants to buy another car."

*Anna Koch,* Government witness. Wife of Heinrich Koch. Knew Herbert Haupt and Hans Haupt. "Q. Calling your attention to the evening of June 22, 1942, at approximately 9 o'clock, were you home that evening? A. Yes. Q. Will you tell us what happened? A. Maybe 9:30 Mr. and Mrs. Haupt and Herbert Haupt came to our house. * * * Then *they talked about his son wanted work.*" "Q. Do you recall what was said? A. Well, they want to say 'Hello,' to see my husband on business when he came in. Q. Into the factory, do you mean? A. Yes, sir." Asked Herbert where he had been and he replied Mexico, and Herbert said he had just bought a nice new suit.

*Richard W. Axtell,* Government Witness.

On June 22, 1942 he was watching the Haupt movements, saw them (Hans, Herbert, and Erna Haupt) drive from Grunau home to Koch home. "With Hans Haupt who was then driving the car,—then we followed the car as it drove off from that address (Grunau) and we followed it and saw them stop in front of * * * residence of Heinrich Koch. * * * As the car stopped the three individuals, that is Hans * * * Erna * * * and Herbert * * * got out of the car and * * * went up to the front porch of the Koch residence. * * * thereafter they were admitted to the residence. I saw them go in. * * * They arrived there at about 10:00 P. M. and they stayed until about 10:30 * * * I saw the three of them, that is Hans * * *, Erna * * * and Herbert * * * came again, came out from the Koch residence, * *. They * * * got into the Plymouth * * * Hans Haupt driving the Plymouth then proceeded on south on Fremont Street."

knowing that the said enemy was an agent of the Government of the German Reich in the United States to commit sabotage, act as a spy and perform other services for said Government as aforesaid, all with the intent and for the purpose of assisting said enemy Herbert Haupt in carrying out his mission as an agent of the Government of the German Reich as aforesaid."

The evidence on this, as well as some of the other "harboring" acts submitted, consists simply of F. B. I. agents testifying they saw the several Haupts enter or leave the front entrance of the 2234 N. Fremont Avenue apartment building. The legal sufficiency of this evidence as "direct" or "circumstantial" will be subsequently discussed. Mr. and Mrs. Kluczyk, the landlord and his wife, who lived on the first floor of the three story building (which also had three apartments in the rear, not reachable by the front entrance) testified that on the evening of the twenty-second, Mr. and Mrs. Haupt and Herbert came to pay a brief call and in answer to the question where Herbert had been, was told Herbert had been to Mexico, South America, and "all over." Mrs. Kluczyk had seen Mrs. Haupt talking to Herbert out on the sidewalk, in the morning. Several of the F. B. I. agents saw all the Haupts enter the apartment building and testified to the condition of the Haupt apartment lights on entry, and shortly after entry, as indicative of occupancy by them shortly after entry. The precise evidence on this Overt Act is also set forth below.[13]

*Overt Act No. 13.* The specific wording of Overt Act No. 13 was:

"Said Hans Max Haupt, on or about June 23, 1942, accompanied the said enemy Her-

---

*John A. Lynch*, F. B. I. Agent, Government Witness.

Assigned to following Herbert Haupt's actions on June 22, 1942. "What did they do after they entered the Plymouth automobile? Did you see who was driving at that time? A. At that time Mr. Max Haupt was driving. Q. Where did they go from there? A. From there they proceeded to 7236 North Odell Avenue. * * * At that residence the car was parked and the three individuals emerged from the car and entered that address * * *. That was the residence of Mr. Koch. * * * They remained in there approximately half an hour * * *. They emerged, entered the car and proceeded back (to the Haupt home) * * *."

*James C. Conerty*, F. B. I. Agent, Government Witness.

"What, if anything, did Mr. and Mrs. Haupt and Herbert Haupt do when you saw them in front of 6361 North Leoti? A. They entered a Plymouth automobile and drove to the address 7236 North Odell." "At what time did Hans and Erna Haupt and Herbert Haupt arrive at 7236 North Odell? A. At approximately 10 P. M. * * * They parked their automobile and three of them entered that address. Q. Do you know now who lived at 7236 North Odell? A. Mr. and Mrs. Koch. * * * They remained there until about 10:30. At that time then they came out and got into the Plymouth * * *."

13 *Barbara Kluczyk*, Government Witness, Landlady of Haupts.

"Q. When was the first time thereafter that you saw Herbert Haupt around your house? A. It was Monday, around eleven o'clock * * *" "Q. Would that be June 22, 1942? A. Yes. Q. Where were you at the time when you first noticed him? * * * A. I saw Herbert and his mother standing out on the sidewalk. * * * Q. When was the next time you saw Herbert Haupt? A. Monday evening. Q. That was the same evening, was it? A. The same evening, June 22, 1942. Q. Where did you see him on that occasion? A. In our apartment. * * * Q. Was any one with him? A. Mr. and Mrs. Haupt. * * * they rang the bell and I let them in * * *."

*Stanley Kluczyk*, Landlord.

"Q. Now, calling your attention to the 22nd day of June, 1942, in the evening were you at home? A. I was home. * * * Mr. and Mrs. Haupt and Herbert came in to me and said, 'Hello.' * * * it was a matter of minutes and they left." "I saw them leaving by their own car." Saw Herbert leaving by taxicab once or twice.

*Frederick Martin Wittrock*, Government Witness.

"Q. Calling your attention to the 22nd day of June, 1942, on Monday evening, where were you on that evening? A. I was at Kluczyk's home. * * * Mr. and Mrs. Haupt and also Herbert Haupt knocked at the door and came into the front room. * * * Mr. Kluczyk asked Herbert Haupt how far have you been, and he said, 'Well, South America, Mexico and all over'; * * *"

*Pennel V. Robe*, F. B. I. Agent.

"Q. Calling your attention to Monday, June 22, 1942, at approximately 7:30 P. M. were you in the vicinity of 2234 North Fremont Street, Chicago? A. Yes, sir. * * * I observed a young man and older lady and older man come out of the address

bert Haupt to the Warner Motor Sales, 958 Diversey Park Way, Chicago, Illinois, to arrange for the purchase of an automobile for the said enemy Herbert Haupt, with the purpose and intent of assisting the said enemy in carrying out his mission as an agent of the Government of the German Reich as aforesaid."

The testimony to support this overt act is that of four F. B. I. agents who were watching the Haupt movements stated they saw them leave the Haupt residence, go to a restaurant, and thence to the Warner Motor Sales, driving in the Plymouth car. They were seen to remain in the sales room for thirty-five or forty minutes, then leave together in the Plymouth car and drive back to the Haupt residence. The evidence is outlined below.[14]

*Overt Act No. 14.* This overt act is couched in these terms:

"Said Hans Max Haupt on or about the 23rd day of June, 1942, while at the Warner Motor Sales, 958 Diversey Park Way, Chicago, Illinois, signal a financial statement and an order for the purchase of an automobile and made an initial payment of money toward the purchase of said automobile, with the intent and for the purpose of procuring an automobile for the said enemy, Herbert Haupt, and with the intent and for the purpose of assisting the said enemy, Herbert Haupt, to carry out his mission as an agent of the German Reich, as aforesaid, and to conceal the identity of Herbert Haupt as such agent."

The evidence on this overt act is that of two witnesses, a salesman, Vincent Farrell, who greeted Hans and Herbert Haupt when they came in and informed him Hans wished to purchase a good used car for his son Herbert. Upon their inquiry, he gave them the cost, the terms of sale, the amount of down payment, the credit arrangement. During the progress of the negotiations, Mr. Phillip Vinson, the general manager, came in and was introduced

at 2234 North Fremont Street * * * They entered a car * * *" (He identified Mr. Haupt in the courtroom.)

*Joseph W. Kriofske*, F. B. I. Agent. Testified he arrived at the Haupt home on June 22, at about 5:45 P. M. "At that time he observed three individuals coming out of the house at 2234 North Fremont." He specified that he saw them coming out of the front entrance. He identified the three individuals as the Haupts.

*James E. Conerty*, F. B. I. Agent. (Testifying re June 22) "Q. And did they subsequently stop at another address? A. They stopped at 2234 North Fremont. * * * Then went in the front entrance. * * * Q. Who * * * went up the steps into that apartment building? * * * A. Herbert Haupt and his mother * * *" "Shortly after Herbert * * * and Mrs. Haupt entered that address, the lights in the front of the third floor apartment were extinguished."

[14] *Edward C. Dixon*, F. B. I. Agent. "Q. Now, on the same afternoon, June 23, 1942, at approximately 5:15 P. M. were you in the vicinity of 2234 North Fremont Street * * * A. I was. * * * At that time (6 P. M.) I observed the young man, * * * and another man, an elderly man, middle aged, * * * come out of the house. * * * They entered the automobile. * * * Q. Where did they go? A. They went to the corner of North—northwest corner of Sheffield and Diversey, I believe it was the Warner Motor Sales. * * * The two men parked their automobile and went inside the Motor Sales room. Q. All right now, what

did you do? A. Got out of the automobile and walked around the corner and observed the show room. Q. Did you see anyone in the show room? A. I did. Q. Who did you see there? A. The young man with the elderly man that was driving with him * * * (identifies elderly man as defendant). Q. How long did they stay in the Warner Motor Sales? A. They came out of the Warner Motor Sales approximately 7:35 * * *" (Testifies the men drove to the Fremont street address).

*John A. Lynch*, F. B. I. Agent. "Herbert and Mr. Hans Max Haupt went into the Plymouth automobile and proceeded to the Warner Motor Sales * * *." "They emerged from there and returned to 2234 North Fremont Street where the car was parked."

*Peter P. Schneider*, F. B. I. Agent. "Q. Where did Hans and Herbert Haupt go when they entered the automobile? A. They drove to Warner Motor Sales at 958 Diversey, West Diversey Parkway. * * * They entered this business establishment." (Testified they were in the place about forty minutes.) "They again entered their Plymouth automobile and the car was driven to 2234 North Fremont * * *."

*Frank F. Meech*, F. B. I. Agent. "They * * * drove to the Warner Motor Sales * * * Hans Max Haupt and Herbert Haupt entered the Plymouth automobile and drove to the Warner Motor Sales. * * * They remained there approximately thirty-five or forty minutes. * * * I saw them emerge at approximately 7:35. * * * They entered

to the Haupts. He OKed the arrangements, saw the deed signed by Mr. Haupt, the credit statement was taken and signed in his presence. The testimony of these two witnesses is summarized below.[15]

*Overt Act No. 15.* The 15th overt act is charged in this language:

"Said Hans Max Haupt on or about June 24, 1942, again accompanied the said enemy Herbert Haupt to the Warner Motor Sales,

---

their Plymouth automobile and drove to 2234 North Fremont. * * * "

[15] *Vincent Christopher Farrell*, auto salesman.

"Q. Were you on duty at the place of business of the Warner Motor Sales * * * on the evening of June 23, 1942? A. I was. Q. Did any prospective customer come in? A. About six o'clock there were two gentlemen that came in. I approached them, and they said they wanted to buy a good late model used car. * * * Q. Did the man, Hans Haupt, * * * say anything to you? A. Well, I asked if I could be of help to him, and he said yes, he wanted to buy a good used late model car. So I showed him a number of cars * * * He seemed to like this car (Pontiac) very much. Said he wanted to know if he could buy it on a time-payment. I said, Well, I have a car, but he says 'I do not intend to trade it in. *It is for my son.*' Q. What was for his son? A. This car that he was buying. So I said, 'You can buy it on time payments.' He wanted to know how much was required to pay down. So I said, 'If you will step over to my desk, we will set up the deal. I will show you just the required downpayment, and the monthly payments, the insurance and so forth.' Q. What was the price of the car? A. $1,045. * * * Q. Was there any decision made as to the purchase of the car that evening? A. Well, I set up the deal * * * " * * * "They wanted to know if they could put $10 down, and I said they could. They said, 'We will have the money, and we will have to bring in some cash.' * * * Hans Haupt wanted to know how much he would have to put down for the car. I said, 'That is approximately half the price of the car.' He wanted to know if he could put down $10 deposit and come the next day, the following day, and put down the balance. I said that would be perfectly satisfactory. So *I wrote up the financial Statement, and asked his name, and he told me, 'Hans Haupt.'* He introduced me to his son as Herbert Haupt. I filled out the financial statement complete, to the Finance Company, and I wrote up the order, and *he signed the order,* and he put down, *ho put down a $10 deposit down on the car.* * * * In the meantime, the manager came in. Q. Who is the manager? A. * * * Phil Vinson. * * * He came in approximately 7 o'clock. * * * I called him over and introduced him to Hans Haupt and to Her-

bert Haupt the son; and told him that they had bought this car, put $10 deposit, and would drop in the following day and pay the balance. He said it looked like a good order, looked very good. * * * Q. Was the signature of Hans Haupt placed there? (On the order) * * * A. That is right. * * * Q. How long did the defendant, Hans Haupt, and Herbert Haupt remain in your place of business that night? A. I venture to say they were there about an hour and a half. * * * Q. In reference to this financial statement, did you state you took a financial statement from him? A. Yes. Q. That information was given to you by whom? A. That was given to me by Hans Haupt. * * * Q. Were there any references given? * * * business associates and friends * * * of Hans Haupt." "Was there any contract executed. A. Well, the usual finance contract. The notes, as you might call them, terms. We refer to it as a contract. That was for the Finance Company. Q. When was that executed? * * * A. The first night. Q. Who signed it? A. Well. Hans Haupt signed that. * * * Q. Who paid the money on this 1941 Pontiac coupe on the first night (June 23)? A. Hans Haupt. Q. How much did he pay? A. He paid as near as I remember, $405. Q. The first night? A. No, $10 down on the first night. Q. But, he, himself, then gave you the name Hans Max Haupt, and no other name? A. He gave me Hans Max Haupt, and I wrote that on the financial statement. Q. But no other name? A. No other name. Q. And he introduced his boy as being Herbert Haupt? A. Herbert."

*Phillip Newell Vinson*, Government Witness.

"Q. Calling your attention to the early evening of June 23, Tuesday * * *, 1942, were you in your place of business on that evening? A. Yes, I returned from supper about 7 or 7:30. * * * Mr. Vincent Farrell, salesman was there with two customers. Q. Subsequently after your arrival there, did you transact some business with those two customers? A. Yes, I did." (Identified photograph of Herbert Haupt.) (Identified Hans Haupt in courtroom.) "Q. Now, will you tell us just what took place on that evening, the first evening? A. * * * Mr. Farrell asked me if I can accept a deal on the 1941 Pontiac * * * for $1,045. * * * That was the selling price. * * * there

958 Diversey Parkway, Chicago, Illinois, to complete the arrangements for the purchase of an automobile for the said enemy with the intent and purpose of assisting said enemy in carrying out his mission as an agent of the German Reich, as aforesaid."

Two F. B. I. agents who were covering the actions of the Haupts testified to seeing the father and son leave the Haupt residence and drive to the Warner Motor Sales Company on June 24, remain there awhile, and then they saw Herbert drive away from the auto company in a Pontiac coupe.

Mr. Haupt had driven them to the auto company in a Plymouth car. The testimony of these two agents is outlined below.[16]

*Overt Act No. 16.* The next overt act of the indictment, submitted to the jury, was:

"Said Hans Max Haupt on or about the 24th day of June, 1942, while at the Warner Motor Sales, 958 Diversey Parkway, Chicago, Illinois, made a further payment in cash toward the purchase of an automobile for said enemy Herbert Haupt and completed arrangements for the purchase

---

was a slight additional charge that should have been put on the car to make a complete deal on the figures * * * Mr. Farrell asked whether he could accept the deal on those figures, and I said, 'Yes, I would.' He said, 'I would like to have you meet the gentlemen.' And he took me over and introduced Mr. Herbert Haupt and Mr. Hans Haupt; they were the purchasers of the car, and *they gave me a $10 deposit, and a credit statement.* Q. Just a minute. Do you know who purchased the car? A. Yes, Hans Haupt. * * * There was no transaction made with me regarding the car. It was made with the salesman. Q. *Were there any documents signed that evening?* Yes, sir. Q. *Did you handle it?* A. Yes, sir. Q. Did you talk to them about it? A. Yes. Q. *Did you talk to them about it?* A. Yes. * * * (identifying document) It is a preliminary bill of sale. Q. *Was that signed there that night?* A. Yes, that was. Q. *Was that in your presence?* A. Yes. Q. *And who signed it?* A. *Mr. Hans Haupt.* Q. And do you know who put down the money; how much money was put down that evening? A. Ten dollars. Q. Who made the $10 deposit? A. Mr. Hans Haupt made the deposit. * * * Q. Now, was there a credit statement or credit memorandum taken that night? A. Yes, there was. * * * Q. *In whose presence was the credit statement taken that night? * * in your presence?* A. It was. Q. *Who signed that credit statement?* A. Hans Haupt. Q. And whose references were given for that credit statement? A. They were Hans Haupt's. * * * The mortgage was signed, and the financial statement was taken and turned over by the salesman to me * * *" (evening of 23rd).

[16] *Pennel V. Robe,* F. B. I. Agent.
"Q. Calling your attention to Wednesday, June 24, 1942, were you in the vicinity of 2234 North Fremont Street, at approximately 6:00 P. M.? A. Yes, sir * * * I saw Herbert Haupt and Mr.

Haupt come out of the residence at 2234 North Fremont * * * They both entered the Plymouth automobile with Mr. Haupt driving and they drove to the Warner Motor Sales * * *. This was on Wednesday, June 24th, that correct? A. Yes, sir. * * *Q. How long were they in the Warner Motor Sales? A. Approximately thirty minutes. Q. Calling your attention to approximately 6:30 P. M., what, if anything did you see? A. I saw Herbert Haupt leave the Warner Motor Sales, driving the 1941 Pontiac coupe."
"Q. Was that the same car that they had, that Hans Haupt had driven to that Motor Sales or a different car? A. It was a different car."

*James C. Berg,* formerly an F. B. I. agent.
"Q. What did these two individuals (Hans and Herbert, whom he saw coming out of Haupt Home at 7 in the evening) do, if anything? A. Both individuals got into a car that was parked in front of 2234 North Fremont. * * * Then they left the residence there, drove to Warner Motor Sales, * * * they went into the sales room, both of the individuals * * * Q. Now, calling your attention to about 5:30 that afternoon, June 24, 1942, did you notice anyone coming in or going out of 2234 North Fremont with another elderly man (identifying Hans Haupt in the court room) * * * Q. What did these two individuals do * * * Both individuals got into a car * * * Then they left the residence there, drove to Warner Motor Sales * * * they went into the salesroom, both of the individuals * * * Q. Which one did you see later? A. I saw Herbert Haupt. * * * He was driving south * * * in a Pontiac coupe * * * Q. How long after he entered the Warner Motor Sales, did you see him in this Pontiac car you described? A. Approximately twenty, twenty-five minutes later." (He followed the Pontiac back to the Haupt home.)

of said automobile and did purchase said automobile for said enemy Herbert Haupt with the intent and for the purpose of assisting said enemy Herbert Haupt in carrying out his mission as an agent of the German Reich, as aforesaid."

The salesman and the general manager of the auto company were the same two witnesses to the car transactions on the second day, June 24th. The salesman handled the transaction, the general manager saw them come in, he received the money paid, saw Mr. Hans Haupt's name on the note, and saw the invoice that evening. In detail this evidence is given in the margin.[17]

*Overt Act No. 17.* This act, charging harboring on June 23, reads:

"Said Hans Max Haupt, on or about June 23, 1942, harbored and sheltered the said enemy Herbert Haupt at the home of Hans Max Haupt, 2234 N. Fremont Street, Chicago, Illinois, well knowing that the said enemy was an agent of the Government of the German Reich in the United States to commit sabotage, act as a spy and an enemy agent and perform other services for said Government as aforesaid, all with the intent and for the purpose of assisting said enemy Herbert Haupt in carrying out his mission as an agent of the Government of the German Reich as aforesaid."

This overt act was proved by two witnesses who saw the father and son come into the apartment—these witnesses were

[17] *Vincent Christopher Farrell,* Government Witness.

"Q. Did Hans Haupt and Herbert Haupt come into your place of business at a later time than the one you have described? A. They came in the following afternoon and brought in $405 in fives, tens, and twenties, and it was about three fifty dollar bills in there. (June 24). * * * Q. They were in there about the purchase of the automobile, is that correct? A. that is right * * * Well, that day, of course, they answered the usual financial—They gave the usual finance notes, of course. Q. *Who signed them? A. Hans Haupt.* * * Q. What did they amount to, do you know, the total? * * * A. It is close of $630 * * * Q. Was there any contract executed? A. Well, the usual finance contract. * * * Q. When was that executed? * * * A. The first night. (June 23) Q. And was there money paid the following night? A. *The following evening they came in and he paid $405. Q. By 'he' you mean whom? A. Hans Haupt.* * * * Q. Was Mr. Vinson there at that time, too? A. He was there, yes. * * * And that $405 was the amount you stated Hans Haupt paid at that sales agency on June 24th, 1942, is that correct? Yes, that is right." "Q. And was that car delivered? A. That car was delivered the following day. He made the payment of what I have there, $405, it was made on the 24th."

*Phillip Newell Vinson,* Government Witness.

"Q. Well, now, calling your attention to the next evening on the 24th of June, 1942, were you present in the salesroom on that occasion? A. I was, yes. Q. Will you tell us what happened on that evening? Q. Who was there? * * * Did you ever at any time see Hans Haupt or Herbert Haupt there the following evening,

the 24th? A. Not that evening, no. Q. You say the 24th you did not see Hans Haupt and Herbert Haupt there? A. No. (following testimony shows witness was in error on this testimony) Q. Do you recall testifying at the last trial? A. Yes. Do you recall these questions being asked you, and you making these answers: 'Question: Calling your attention to the next day, the 24th of June, 1942, did you see either Hans Haupt or Herbert Haupt there that evening? Answer: Yes, I did.' 'Question: And where did you see them?' Answer: I saw them in the office together. Question: They came in there together, did they? Answer: That is right. Question: What, if any, conversation did you have with them at that time? Answer: None whatsoever. Question: Did you see them come in? Answer: Yes, sir. Question: Did you receipt for money that they had put on a down payment? Answer: We did. Q. Do you recall those questions and answers? A. I do. I was mixed up in my story. I did not talk to them. I saw them. I saw them come in and I was mixed up when I said I didn't speak to them. *I saw them come in I was there at the time.* * * * Q. And you said on that occasion you didn't talk to them yourself? A. No. Q. *Did you receive the money that had been put down? A. I did. Q. On that evening? A. Yes. * * * Q. Whose name was on that note?* A. It was Hans Haupt. * * * Q. Did you see the invoice that was made on that evening, June the 24th, with reference to the purchase of this car? A. I did. * * Q. And was Mr. Farrell there that evening? A. Yes, sir, he was there. * * Q. Mr. Vinson, in the first statement on the stand, you said you did not see them come in, then you later corrected that. A. That is correct, I misunderstood. I did not speak to them. I saw them both there.

actually in the home of defendant. Four other witnesses, F. B. I. agents, gave evidence of entry into the apartment building, and exit therefrom after lengthy intervals, of the defendant and his son.[18]

*Overt Act No. 20.* This overt act charged the harboring and sheltering of Herbert Haupt, in substantially the same language as Overt Act No. 17, just quoted, except that said act concerned June 24, 1942.

The proof on this overt act was the testimony of four F.B.I. agents who related the times they saw the defendant and Herbert

---

I saw them when they came in the second time."

[18] *Mrs. Gerda Saure,* Witness for Government.

"Q. * * * *how long did you remain in there in the living room with Herbert Haupt in the Haupt home* at 2234 Fremont St., * * * A. about two or two and a half hours." Herbert had gone out to meet her and she had come in so the defendant went out and got Herbert, and *they came back together.*

*Gustave Zermer,* Government witness.

"Q. Now, calling your attention to the evening of June 23, 1942, that would be Tuesday evening; *were you in the Haupt home on that evening? A. Yes, Sir.* * * Q. How long did you remain with Mrs. Haupt before Hans Haupt or Herbert Haupt came back? * * * And did they come in separately or together? A. *They were together. Q. And did they come into the apartment there, also? A. Yes, sir.*" Then tells of the fiancee coming to the apartment. "Q. And where did they go? A. They were in the kitchen eating supper. Mrs. Haupt had supper ready and she was waiting for them. * * * Q. When you say 'They ate first,' who do you mean? A. The three. Q. Who? Mr. Haupt, Mrs. Haupt, and Herbert Haupt." Then recites about Herbert and his fiancee going into the parlor. * * * "What was said in the front room about an automobile? A. Mr. Haupt bought an automobile, and that was all. She asked him the price * * * Hans, who was there, he commenced talking, and he said to Mrs. Haupt he bought a machine." "Mr. Haupt asked me if I got a room for Herbert in my house, and I said, 'No, I got a room for me alone then what do you want a room for?' * * * Q. Did you ask why he wanted Herbert to get a room at your place? A. They got just one bedroom, see and they don't want to lay down in the front room." * * * Then tried refreshing the witness' memory from testimony at last trial. " 'Question: Were you asked this question at that time and did you make this answer: 'That he was afraid for Herbert to remain in his apartment at 2234 North Fremont Street.' Did you tell that to the FBI * * * Answer: Yes. Q. Was it true? A. Yes. * * * Q. So Hans Haupt told you that night that he was afraid to have Herbert

around the house, is not that true? A. Yes, sir." * * * On cross examination tells of Hans and Herbert Haupt coming to the apartment together. * * * Testified on re-direct examination that Herbert and Hans came in the apartment. Says they went right into the kitchen and had supper. Defendant and Herbert were in the apartment. They were eating supper.

*Edward C. Dixon,* FBI Agent.

He saw father and son go into the building (Haupt home) at ten of nine, and son come out at 10:15.

*John A. Lynch,* FBI Agent.

Testified to having seen Herbert come out of Haupt residence at 12:30 P. M., re-enter it at 5:15; "At six o'clock I observed Hans * * * and Mrs. Haupt and Herbert * * * emerge from the residence * * * (Haupt home) and enter the Plymouth automobile * * *." Mr. Haupt and Herbert then went to Warner Motor Sales. "Then they (Hans and Herbert) proceeded to 2234 North Fremont Street where they both entered * * *. It was approximately 8:35 or 8:40. * * * At about 10:15 P. M. I saw the lights of the Plymouth automobile go on and then saw Herbert * * * driving south on Fremont Street."

*Peter P. Schneider,* FBI Agent.

"Q. * * * calling your attention to June 23, 1942 * * * where did the individual (Herbert Haupt) go * * *. A. He walked to the vicinity of 2234 North Fremont Street. * * * At 6 P. M. I observed Herbert Haupt and Mr. Haupt and Mrs. Haupt leave 2234 North Fremont Street * * * They came out the front entrance * * * entered a Plymouth automobile * * * A. From this tavern they returned to 2234 North Fremont. * * * At that time; both Herbert Haupt and Mr. Haupt entered the building at 2234 North Fremont. * * * Approximately 10:15 P. M. Herbert Haupt and a young lady left 2234 North Fremont. * * * A. That Plymouth automobile returned to 2234 North Fremont. * * * At that time Herbert Haupt entered the front entrance of the building at 2234 North Fremont. * * * Q. And then both of them after going into some tavern or something for about five or ten minutes, went home, is that right, to Mr. Haupt's home, to 2234 North Fremont Street? A. Correct. Q. And that was

entering and leaving the premises of the Haupt residence, and also the testimony of the landlady who saw the mother and son outside the building, walking away from the building.[19]

*Overt Act No. 21.* This overt act alleges "harboring" of the agent of the German Reich in the same language as the other harboring counts, except it concerns June 25, 1942. As to this day ten F. B. I.

---

somewhere around 8:30 or so? * * *A. 8:50 P. M. * * * I saw him leave at 10:15 P. M. * * *"

*Marvin W. Lewis,* FBI agent.

"Q. * * * did you * * * arrive in the vicinity of 2234 North Fremont Street * * * about 10 o'clock on June 23rd, * * * A. Yes, I did. * * * 10 P. M. Q. Now, did you observe anything in the vicinity of 2234 North Fremont Street approximately at that time? A. Approximately 10:15 P. M. * * * I observed an automobile coming south on Fremont Street * * * Q. After the young lady left the car, did you continue to follow the car in which Herbert Haupt was in? A. Yes, we did. * * * It went to 2234 North Fremont Street. * * * Herbert Haupt got out of the car and entered that particular address." "He went through the iron gate, which was at the very entrance to the property and up on the porch, in through the front door. * * * At the time the automobile was parked in front of 2234, there were no lights on the third floor, and a few minutes after Herbert Haupt entered that particular building lights did appear on the third floor (the Haupt apartment) * * Q. Now, about what time did the lights go out? A. I would say about 12:40 A. M."

*Mrs. Saure* called as witness for defendant.

Tells of visiting at Haupt apartment Tuesday evening, June 23rd. She asked where Herbert was and was told he had gone out to meet her. "Mr. Haupt went out and said he would see if he could locate him, and tell him I was there, which he did then they both came back together."

19 *Barbara Kluczyk* (landlady).

"A. Now, later on during that week did you see Herbert Haupt around the house there? A. Only a couple of times. Q. When was the next time? * * * A. I saw him go away once with a taxi. * * Q. After that did you see him on any other occasion during that week? A. Yes. It was on Wednesday noon * * * around eleven or twelve * * * Q. Where were you at that time? A. In our apartment. * * * In the front room. * * * Q. Was he alone * * * A. With his mother * * * They were walking south * * *."

*John A. Lynch,* F. B. I. Agent.

"At 12:30 A. M. I observed Herbert Haupt park the Plymouth automobile in front of the residence at 2234 North Fremont Street, then enter the residence at that address. * * * Well, I saw him enter a sidewalk, pass the iron gate which is in front of the residence, proceed up the steps to the porch. From the position that I was in I could not see the door. Is that the front porch you are speaking of? A. That is right. (Identifies Herbert Haupt's picture) * * * Is there any other place that a person can go on that porch, after he goes up the stairs? I mean, is there any other way to go around the side of the building after you get on the porch? A. No, there is not, only one door. * * * Q. Now, calling your attention to approximately 7:00 o'clock in the morning of the 24th; I think you said just a moment ago you saw Herbert Haupt go in at 12:30 A. M.? A. That is right. Q. At 7:00 o'clock in the morning on June 24, 1942, will you tell us what, if anything you observed? A. At 7:00 o'clock I saw Mr. Max Haupt emerge in his work clothes and enter the Plymouth (emerged from residence) * * * At 1:00 P. M. on June 24 I noticed Herbert Haupt emerge from 2234 North Fremont Street, stand in front of the residence for about a minute at which time a taxicab drove up and he entered the taxicab * * *."

*Pennel V. Robe,* F. B. I. agent.

"Q. Calling your attention to Wednesday, June 24, 1942, were you in the vicinity of 2234 North Fremont Street, at approximately 6:00? A. Yes, sir. Q. Will you tell us what you observed at that time? A. I saw Herbert Haupt and Mr. Haupt come out of the residence at 2234 North Fremont Street."

*James C. Berg,* former F. B. I. Agent.

"Q. Now, calling your attention to about 5:30 of that afternoon, June 24, 1942, did you notice any one coming in or going out of 2234 North Fremont? (Haupt home) A. Yes, sir. * * * A. Young man walked in to the 2234 North Fremont. * * * Herbert Haupt. * * * Q. Did you later see that young man again, Herbert Haupt? A. About 6 o'clock the same day, in the evening. * * * He came out with another elderly man (identified defendant). * * * He (Herbert) got out of the car, went up to the house at 2234 North Fremont. * * * Q. What time did he go up the front steps? A. Probably around 6:35 or 6:40. * * * Approximately ten minutes later, the same day, he came out of the house, entered his car and drove away. * * *" (Agent followed him to several other places) "A.

agents testified they saw Herbert enter and/or leave the Haupt building; one other person also so testified. They testified that an existing light in the Haupt apartment was extinguished a few minutes after entry into the building; also, that upon exiting, Herbert was wearing different garb than when he entered.[20]

He returned home around 9:15 in the evening." (Herbert walked around car and went back in and drove away.)

*Frank E. Meech*, F. B. I. Agent, Government Witness.

"* * * calling your attention to June 24th, 1942, were you in the neighborhood of 2234 North Fremont about 7 o'clock in the morning of that day? A. Yes. * * * at approximately 7:05 in the morning, Hans Max Haupt emerged from the residence 2234 North Fremont, entered a Plymouth automobile * * * At approximately 1 o'clock in the afternoon Herbert Haupt emerged from the address 2234 North Fremont and entered (a cab) * *."

20 *Carl Eggert*, Government witness.

"Q. Now, you say he came out of the house? A. That is right (Herbert came out). * * * Now then what happened, Mr. Eggert? A. Then a minute or two later Hans came out of the house. * *"

*Richard W. Axtell*, Government witness, F. B. I. Agent.

"Calling your attention to the 25th of June, 1942, at approximately 12 P. M. were you in the vicinity (of the Haupt home) * * * ? A. Yes, I was. * * * Q. What did you see him do at that time, about 12:00 P. M.? A. * * * after he parked the car I saw him go into the residence of 2234 North Fremont. Q. That was after midnight? A. Just about midnight of the 25th. Q. Did you observe the condition of the lights at that time in the third floor apartment? A. Yes, sir, I did. * * * Shortly, after Herbert went into that building * * * I saw the lights on the third floor go off—that is, they were extinguished."

*John A. Lynch*, F. B. I. Agent, Government witness.

"Q. * * * calling your attention to June 25, 1942, * * * were you in the vicinity of 2234 North Fremont Street at about 4:20 P. M.? A. Yes, sir, I was. * * * At that time I observed Herbert Haupt drive north on Fremont Street in a Pontiac coupe, park in front of 2234 North Fremont Street and enter the residence there."

*Pennel V. Robe*, F. B. I. Agent.

"Q. What did you observe at approximately 12:55 A. M., June 25? That would be early morning? A. I observed Herbert Haupt enter the residence at 2234 North Fremont Street."

"Q. At approximately 4:20 P. M. on that same day what did you see? A. I observed Herbert Haupt entering the residence at 2234 North Fremont Street. Q. That was on June 25, 1942, is that correct? A. Yes, sir."

*James C. Berg*, F. B. I. Agent, Government Witness.

"He (Herbert) proceeded to 2234 North Fremont (at 12:45 on the early morning of the 25th). Q. Did he walk into the building? A. He was walking up the steps, yes, sir."

*Phillip C. Dunne*, Government Witness, F. B. I. Agent.

"Q. Calling your attention to the early morning of June 25, 1942, at approximately 1 A. M., did you see (Herbert Haupt). * * * Yes, sir, I did. * * * At that time, Herbert Haupt drove up from the north on Fremont in his automobile, parked the car, got out * * * went around the front of the car, entered through the iron gate, up the stairs of the residence at 2234 North Fremont and entered the residence at 2234 North Fremont. * * * Q. What happened after Herbert Haupt entered the house, as far as the lights are concerned? A. After Herbert Haupt entered the house at 2234 North Fremont, the lights in the front room of the third floor went on. Q. Did they remain on? A. For approximately fifteen minutes. * * * Then they went out. * * *"

*James C. Conerty*, F. B. I. Agent, Government Witness.

"Q. * * * calling your attention to June 25, 1942, were you in the vicinity of 2234 North Fremont Street? A. I was. * * * Q. * * * did you observe anything with reference to 2234 North Fremont Street? A. At that time I saw Hans Max Haupt, and another unknown individual leave the address at 2234 North Fremont * * * and proceed to the said Plymouth automobile * * * Q. Now, did you observe anything a little later after 1:10 that morning? A. At about 7:15 that morning, I observed Herbert Haupt come out of the same entrance at 2234 North Fremont and walk to a Pontiac coupe that was parked in front of that address. * * * A. He entered the car about ten minutes later, Hans Max Haupt and this other unknown individual, and drove south on Fremont and they were immediately followed by Herbert Haupt in his Pontiac coupe. * * * Q. Now, calling your attention to about 4:20 P. M. on June 25, 1942, did you observe anything with reference to 2234 North Fremont Street * * * A. At about that time I observed Herbert Haupt drive up in a Pontiac and park the car and get out

*Overt Act No. 22.* This is another "harboring" charge, and covers June 26, 1942. Its language is similar to the foregoing. On this charge, four F. B. I. agents testified to seeing Herbert Haupt enter, or leave the premises of the defendant's home, that he had different clothes on upon leaving than when entering; one testified he saw him on the stoop of the apartment building.[21]

and go to the front entrance of that address. Q. Did you observe anything with reference to 2234 North Fremont at about 6:45 on June 25th? A. At about that time I observed Herbert Haupt leave the address 2234 North Fremont by the front entrance, get into a Pontiac coupe and drive south on Fremont. Q. Did you observe how Herbert Haupt was dressed at that time? A. At that time he had apparently made a change of clothing, because when he entered at 4:20 he was wearing a light tan suit and when he came out at 6:45 he had a gray-green sweater and cap."

*Elmer Fletcher*, F. B. I. Agent, Government Witness, recalled.

"Q. Now, on June 25th, 1942, were you in the neighborhood of 2234 North Fremont Street? A. Yes, I was. * * * I observed Herbert Haupt drive up in front of the address, 2234 North Fremont Street and enter this address. * * * Approximately 1 A. M. Q. Did you see him go up the steps, front entrance? A. Yes, I did. * * * I was there approximately at 4:20 P. M. in the afternoon. * * * I observed Herbert Haupt enter the residence 2234 North Fremont." (Gave much testimony about following Herbert around in the Pontiac car, to various cafes and hotels.)

*Frank F. Meech*, F. B. I. Agent, Government Witness.

"Now, calling your attention to Thursday, June 25, 1942, were you in the neighborhood of 2234 North Fremont? A. Yes, I was. * * * at approximately 4:20 in the afternoon Herbert Haupt drove up in the Pontiac car, it is the address, 2234 North Fremont Street. * * * He went up the steps onto the porch where he disappeared."

*Marvin W. Lewis*, F. B. I. Agent, Government Witness.

"Q. Now calling your attention to June 25th, 1942, did you again that evening observe Herbert Haupt? A. Yes, I did. * * * Approximately 12, midnight. * * * I observed him driving his automobile, a Pontiac automobile which he parked about two houses north on 2234 on the west side of the street. I saw him get out of the car * * * walk over to the same gate, and enter the building, 2234 * * *. He went up the front steps through the front door. * * * Before he went in the house, the lights on the third floor were out. A few minutes after he entered, the lights were on. After about ten minutes, the lights were out."

*George D. O'Connor*, F. B. I. Agent.

"He got into an automobile drove to 2234 North Fremont where he got out of the car and went into the building at that address. * * * It was about midnight of the evening of June 25, 1942 (testified the lights on the third floor went out shortly after Herbert got home)."

[21] *James C. Conerty*, F. B. I. Agent, Government Witness.

"Q. Now, calling your attention to June 26, Friday, 1942, at about 5 o'clock in the afternoon, were you in the vicinity of 2234 North Fremont? A. Yes, sir, I was. * * * I was at 2231 North Fremont, on the first floor apartment, which is directly across the street from 2234 North Fremont. * * * what, if anything, did you observe with reference to 2234 North Fremont Street? A. I observed Hans Max Haupt drive up in the Plymouth automobile, park the car and enter the residence * * * At about 6 o'clock the same day, I observed Herbert Haupt drive up in his Pontiac coupe, park the car at the same address, by the same entrance. * * * At about 7:15 I observed Max Haupt leave the residence by the front entrance; at that time he was alone. He went to his automobile * * * and drove south * * * At about 8 o'clock I observed Herbert Haupt and his mother, * * * leave the residence by the front entrance, get into the Pontiac coupe and drive south * * *."

*Elmer Fletcher*, F. B. I. Agent, Government Witness, recalled.

"He proceeded to the address 2234 North Fremont * * * Q. In this same black Pontiac car he arrived in? A. Yes, sir. * * * He entered this address. * * *"

*Marvin W. Lewis*, F. B. I. Agent, Government Witness.

"Q. Now, that morning of the 26th, while you were still observing the house, did you again see Herbert Haupt? A. Yes, I did. * * * It was 9 o'clock A. M. * * * when he went the evening before, that is, on the 25th, at midnight he wore a green sweater, tan gabardine trousers and a pair of brown and white shoes, white and green colored Panama hat with rim turned down. Q. Do you recall how he was dressed when he came out from 2234 on the morning of June the 26th? A. Yes, I do. He was wearing a tan gabardine suit, that is a coat and jacket, with

*Overt Act No. 23.* The final act submitted to the jury is also a "harboring" accusation, in similar terms as the other harboring charges, except that it deals with the day of June 27, 1942. Five F. B. I. agents testified to the entering and leaving of the building by Herbert Haupt.[22]

It would seem inexcusable to set forth the lengthy statement of witnesses which supports or tends to support the numerous

a pair of brown and white shoes." * * * "Now, you state that at about 9 o'clock in the morning, June 26th, that you saw Herbert Haupt leave 2234 North Fremont? A. I saw him leave that particular address, yes, sir. * * * Q. Now, did you later return to that particular building, 2231 North Fremont? A. Yes, I did at approximately 8 P. M. of June the 26th." "Q. Now going back to June 26, 1942, did you see any one enter that home on that day you recognized other than Herbert Haupt? A. Yes, I did. At 11:00 P. M. I observed Hans Haupt enter that house. * * * "

*James F. Hynes,* F. B. I. Agent, Government Witness.

"Q. Calling your attention to June 26, 1942, approximately at 12:15 in the morning, did you * * * go down to 2234 North Fremont Street * * * At about 9:00 A. M. June 26th I observed Herbert Haupt on the stoop of 2234 North Fremont, come out on to the sidewalk." (Herbert got into Pontiac and drove away.)

*George D. O'Connor,* F. B. I. Agent, Government Witness.

"* * * that morning (June 26) at seven o'clock approximately I saw Hans Haupt come out of the building * * * Q. Did you later see Herbert Haupt? A. Yes, he came out about nine o'clock. * * * Out of the building at 2234 North Fremont."

[22] *John A. Lynch,* F. B. I. Government Witness.

"Q. Will you tell us what you observed at 1:50 A. M. on June 27, 1942? A. At 1:50 A. M. or thereabouts, approximately, I observed Herbert Haupt park the Pontiac coupe in front of the residence at 2234 North Fremont Street; then get out of the car. * * * Herbert Haupt entered the residence of 2234 North Fremont * * * Q. Now, calling your attention to 9:05 A. M., or approximately thereabouts on that same morning, June 27, 1942, what, if anything did you observe? A. At that time I observed Herbert Haupt emerge from his residence at 2234 North Fremont Street and enter the Pontiac coupe and proceed south * * *."

*Pennel V. Robe,* F. B. I. Agent, Government Witness.

"Q. Calling your attention to Saturday, June 27, 1942, at approximately 1:50 A. M., what if anything did you observe? A. I observed Herbert Haupt entering the residence at 2234 North Fremont Street. Q. At approximately 9:05 A. M., what if anything did you observe? A. I observed Herbert Haupt leave the residence at 2234 North Fremont Street."

*Elmer Fletcher,* F. B. I. Agent, Government Witness.

"Now, calling your attention to about 8:20 A. M., Saturday, June 27th, were you in the vicinity of 2234 North Fremont? A. Yes, I was. * * * I observed Herbert Haupt come from this residence (about 9 o'clock A. M.) enter his car * * *."

*Marvin W. Lewis,* F. B. I. Agent, Government Witness.

"Q. Did you see Herbert Haupt at any time that evening or early morning hour of the next day? A. Yes, I did. At 1:50 A. M., the same Pontiac automobile was parked directly in front of 2234, and I saw Herbert Haupt get out of that automobile, and enter the building at 2234. * * * He entered directly through the front door, up the porch, into the front door. * * * The lights were out at the time he entered the building; they came on in a few minutes after he entered the building, and they remained on for approximately ten minutes, at which time they were put out. Q. Did you have an opportunity to observe what clothes he was wearing at the time? * * * Yes. At the time he came in he was still wearing the suit, that is, the coat and pants of the same color, and gabardine. * * * Q. Now, calling your attention to 9 o'clock of the morning of the same day, did you again see Herbert Haupt? A. Yes, I did. * * * He came out of the front door of the building, 2234 North Fremont Street. * * * "

*Frank F. Meech,* F. B. I. Agent, Government Witness.

"Q. Now calling your attention to Saturday, June 27th, 1942, at approximately 1:50 A. M., were you in the neighborhood of 2234 North Fremont at that time? A. Yes, I was. * * * I observed Herbert Haupt drive up in front of 2234 North Fremont * * * Q. By entering the address, did you see him go up on the steps of the porch? A. That is correct, go up on the steps of the porch, yes. Q. Now, calling your attention to about 9:05 A. M., on that same date, the 27th, were you in the neighborhood of 2234 North Fremont? A. Yes, I was. * * * Well, approximately 9:05 I saw Herbert Haupt come off the porch at the address 2234 North Fremont, come down the steps out to a Pontiac automobile which he entered and drove south * * *."

so-called overt acts. We feel like apologizing therefor. Yet, on the theory advanced by the defendant's counsel we have found no way to avoid it. The errors assigned deal not only with the legal sufficiency of the acts and deeds of the defendant but also with the sufficiency of the evidence to establish or make a jury question as to whether two witnesses proved all of them and by direct testimony. He also assails the instructions given by the court to the jury in respect to said overt acts and the necessity of proving all of them.

## Sufficiency of Proof of Overt Acts, by Two Witnesses.

(A) *The Overt Acts as to Harboring.*

Overt Acts 12, 17, and 20-23, charged harboring each of the successive days from June 22 to June 27. As to several of these days there was simply the testimony of F. B. I. agents that they saw the saboteur, Herbert, and his father leaving and going into the front entrance of the six-apartment building wherein the Haupts lived. Counsel for defendant strenuously argues that there is no *"direct"* proof that Herbert was actually in the Haupt apartment, the F. B. I. testimony being *circumstantial* proof.

This argument is drawn from the language in the Cramer case [325 U. S. 1, 65 S.Ct. 932]:

"While to prove giving of aid and comfort would require the prosecution to show actions and deeds, if the Constitution stopped there, such acts could be inferred from circumstantial evidence. This the framers thought would not do. So they added what in effect is a command that the overt acts must be established by direct evidence, and the direct testimony must be that of two witnesses instead of one."

In our opinion the testimony of persons who saw the son enter the front entrance which led to the front three apartments of the six apartment building, on the third floor of which the defendant-father lived, saw lights either go on or off in the third floor apartment soon after entry of the persons, saw the son emerge in different garments than that in which he entered that same entrance some time before; saw the son leave *many hours* after having entered —is *direct* testimony that said son was being quartered in the father's home. To call such evidence circumstantial, rather than direct, is the extreme of tenuity. Such was not the protection intended to be accorded by the Constitution to one charged with treason, when it required the testimony of two witnesses to the same overt act. It is worthy of passing note that it is the decision in the Cramer case, not the definition found in the Constitution, which adds the necessity of *"direct"* evidence." We must, however, and do follow the court holding.

## Sufficiency of Proof as to other Overt Acts.

(B) *The Automobile Transactions.* Overt Acts 13 to 16 covered the automobile transactions. Two of the acts charged accompanying by the defendant, of the son, to the auto sales agency. Two charged the signing of the financial statement, making initial payment, and the further payment on the car.

The proof of accompanying is also by F. B. I. agents, as well as of the two men in the agency. There can be no doubt that two witnesses testified to the father's going with the son to the agency; nor that he signed the statement, nor that he handed over the cash.

Counsel for defendant argues that there were not two witnesses to the financial aspects of the transaction, that the deal was handled by the salesman, and the manager came in later, or was at some distance from the parties at the time of the negotiations. A careful reading of the testimony of Mr. Vinson, discloses that he was cognizant of the whole transaction, had met the father and son, had been consulted by the salesman as to whether the price were satisfactory (having been reduced by the salesman); he talked with them about the preliminary bill of sale; it was signed in his presence by the father; the credit statement was made in his presence. As to the next evening (June 24) the manager had no conversation with the father and son, but he saw them come in, he stated "we" receipted for the down payment, and he received the money which had been put down, saw Hans Haupt's name on the note, and saw the invoice.

To discount testimony of the manager as above outlined as not *direct* support for the charge of the overt act that "Hans * * * while at the Warner Motor Sales * * * made a further payment in cash towards the purchase of an automobile for said enemy Herbert Haupt and completed arrangements for the purchase of said automobile and did purchase said automobile for said enemy Herbert Haupt" would

seem to us ludicrous—were this not the serious charge of treason.

### Sufficiency of Proof as to Third Group of Overt Acts, To-wit 10 and 11.

(C) *Accompanying Herbert to Regain Employment in Simpson Optical Co.* These Acts charged the father with "accompanying" the son to the homes of two persons influential in the company for the purpose of assisting Herbert in seeking re-employment. There is no doubt that the father did accompany the son to these homes, that he was present when the son asked for re-employment, sometimes volunteered information as to the son's whereabouts in the interval since he left the employ of the company, or that the son had now registered for the draft, etc. This was established by the testimony of two witnesses. There can be no doubt the father's (and mother's) presence lent an air of respectability (and moral support) to the son's application—gave the impression that here was a returned traveller now ready to renounce farflung adventure (digging for gold) and settle down to the serious business of making a living.

### Legal Sufficiency of the Overt Acts Charged.

*Introductory.* The Cramer case supplies many markers of the legal attributes of a treasonable overt act. Alas, not all of them contribute to clarity of understanding. Still they are our guides. We quote therefrom:

"Of course the overt acts of aid and comfort must be intentional as distinguished from merely negligent or undesigned ones. * * * he must intend to betray his country by means of the act. * * *

"Actions of the accused are set in time and place in many relationships. Environment illuminates the meaning of acts, as context does that of words. What a man is up to may be clear from considering his bare acts by themselves; often it is made clear when we know the reciprocity and sequence of his acts with those others, the interchange between him and another, the give and take of the situation."

"From duly proven overt acts of aid and comfort to the enemy *in their setting,* it may well be that the natural and reasonable inference of intention to betray will be warranted. * * *

"The very minimum function that an overt act must perform in a treason prosecution is that it show sufficient action by the accused, *in its setting,* to sustain a finding that the accused actually gave aid and comfort to the enemy. * * * '

"It may be that in some cases the overt acts, sufficient to prove giving of aid and comfort, will fall short of showing intent to betray and that questions will then be raised as to permissible methods of proof that we do not reach in this case. But in this and some cases we have cited where the sufficiency of the overt acts has been challenged because they were colorless as to intent, we are persuaded the reason intent was left in question was that the acts were really indecisive as a giving of aid and comfort. When we deal with acts that are trivial and commonplace and hence are doubtful as to whether they gave aid and comfort to the enemy, we are most put to it to find in other evidence a treacherous intent."

All of the acts charged in this indictment *could* have been innocent acts. Parents house their adult children; they buy them cars; they help them seek employment. But such children are rarely enemies. Yet even performance of the accused acts for an enemy-child might not establish treason. The *setting* for the overt acts, i.e., *the father's knowledge of the enemy-son's mission with specific instructions to acquire a car to effectuate the mission's objects, to gain re-employment to obtain knowledge of the Norden bomb sight and plans of the Simpson Company,*—it is this setting which transforms the innocent into the sinister.

We believe the defendant is laboring under one fundamental misapprehension of the Cramer case—that we may not take extraneous evidence, allegedly by one witness alone, to breathe traitorous design into seemingly innocuous acts. He relies on this statement taken from the Cramer opinion:

"Every act, movement, deed, and word of the defendant charged to constitute treason must be supported by the testimony of two witnesses. The two-witness principle is to interdict imputation of *incriminating acts* to the accused by circumstantial evidence or by the testimony of a single witness. The prosecution cannot rely on evidence which does not meet the constitutional test for overt acts to create any inference that the accused did *other acts* or did *something more than was shown in*

the overt act, in order to make a giving of aid and comfort to the enemy." (Latter italics ours.)

We do not construe this quotation to deny the right to prove by extraneous evidence the *intent* with which the *very acts charged* were done. Quite shortly after the above quotation, the court says:

"It may be that in some cases the overt acts, sufficient to prove giving of aid and comfort, will fall short of showing *intent to betray* and that questions will then be raised as to permissible methods of proof that we do not reach in this case. But in this and some cases we have cited where the sufficiency of the overt acts has been challenged because they were colorless as to intent, we are persuaded the reason intent was left in question was that the acts were really indecisive as a giving of aid and comfort. When we deal with acts that are trivial and commonplace and hence are doubtful as to whether they gave aid and comfort to the enemy, we are most put to it to find in other evidence a treacherous intent."

We think the earlier language in the same opinion is of prime importance in construing the legal requisites of proof of *intent* to betray. The court says:

"Bearing in mind that the constitutional requirement in effect is one of direct rather than circumstantial evidence, we must give it a reasonable effect in the light of its purpose both to preserve the offense and to protect citizens from its abuse. *What is designed in the mind of an accused never is susceptible of proof by direct testimony. If we were to hold that the disloyal and treacherous intention must be proved by the direct testimony of two witnesses, it would be to hold that it is never provable.* It seems *obvious* that adherence to the enemy, in the sense of *a disloyal state of mind, cannot be, and is not required to be, proved by deposition of two witnesses.*

"Since intent must be inferred from conduct of some sort, we think it is permissible to draw usual reasonable inferences as to intent from the overt acts. The law of treason, like the law of lesser crimes, assumes every man to intend the natural consequences which one standing in his circumstances and possessing his knowledge would reasonably expect to result from his acts. *Proof that a citizen did give aid and comfort to any enemy may well be in the circumstance sufficient evidence that he ad-*

hered to that enemy and intended and purposed to strike at his own country."

Of great importance is also this statement:

"It is only overt acts by the accused which the Constitution explicitly requires to be proved by the testimony of two witnesses. It does not make other common-law evidence inadmissible nor deny its inherent powers of persuasion. It does not forbid judging by the usual process by which the significance of conduct often will be determined by facts which are not acts. Actions of the accused are set in time and place in many relationships. Environment illuminates the meaning of acts, as context does that of words. *What a man is up to may be clear from considering his bare acts by themselves; often it is made clear when we know the reciprocity and sequence of his acts with those of others,* the interchange between him and another, the give and take of the situation."

In the Cramer case, the court held the act of "tippling in a tavern" to be a harmless act, of no possible benefit to the enemy, but even possibly a detriment to the illegal venture. No evidence was shown of any aid or comfort given at that tavern meeting—not even that Cramer had paid for the food or drink.

The Court thought, on the other hand, an overt act charging the taking a large sum of money from the German agent was not such a "usual amenity of social intercourse" and was of such fibre as could constitute an overt act in a treason case. They noted that Cramer had given the German agents no "shelter, nothing that can be called sustenance or supplies, and there is no evidence that he gave them encouragement or counsel, or even paid for their drinks." They said, "Meeting with Cramer in public drinking places to tipple and trifle was no part of the saboteurs' mission and did not advance it. It may well have been a digression which jeopardized its success."

The overt acts here involved were *harboring an enemy, buying a car, accompanying to seek re-employment,* the first an essential to any accomplishment of the saboteurs' mission, the latter two were directly ordered by the saboteur's superior. Their seeming harmlessness therefore is dispelled when they are viewed in their "setting," their "environment." During the week the son was with the father, little

else was done (except visits to restaurants, cinema, taverns, and friends).

*Harboring and sheltering overt acts.* There can be little doubt that on the respective dates alleged, the son, Herbert, stayed overnight in his father's home, ate meals there, changed clothes there, and lived as a regular member of the family.

Nor can we entertain much doubt that the harboring and sheltering, with the treasonous intent, constitute adhering to the enemy and giving aid and comfort. A saboteur must be lodged, and he must be lodged in a safe place if his mission is to be effected. One witness testified that the father sought lodging for the son at another place, also a "mailing address" at this witness' rooming house, but did not succeed. It was essential for the son to be quartered in Chicago if he were to gain re-employment with the Simpson Optical Company, in accordance with his directions.

We are clearly of the opinion that an overt act which showed the knowing harboring of a saboteur was an act which met the requirements of the Constitutional definition.

*The Overt Acts re purchase of automobile.* It is defendant's argument that the purchase of the automobile was an innocent act in its entirety—the father had been using the son's Plymouth car during his absence, using it hard, and upon the son's return immediately went about to replace it with another car. While this explanation has plausibility, it does not comport with the facts actually disclosed.

One of the instructions Herbert received was to obtain a car to facilitate transportation of the explosives from the beach in Florida, for delivery to the various points of sabotage, and as a means of travel for the members of the expedition. The purchase of the car was arranged for within a couple of days of Herbert's return—showing urgency of his duty. The old Plymouth car had not become obsolete, in fact it was used by the Haupt family during the week of surveillance. There would not have been the rush to buy the new car, without the pressing need for it. This son had just returned from a year's absence, yet he and the father immediately went out and arranged for the purchase of a car on one day and picked it up the next—paying for it in cash, which included several $50 bills. The father purchased this car in his own name, signed the financial statement, gave references. It is most probable it was the enemy-son's money, yet the father purchased the car. The father drove him there, took part in all the negotiations.

We do not feel this, a harmless innocent act, incapable of being an overt act in a treason charge, although an ordinary act in every day life. Here it was an essential link in a deadly chain. It was an indispensable instrumentality to the effectuation of the mission of the saboteur group.

Defendant stresses the negligibility of the father's driving the son ("accompanying") him to the motor sales place as an overt act. True, it may not be considered as of gross proportion in the entire scheme of things, but it was essential, and the father's driving the son there facilitated the accomplishment of the purchase.

*Sufficiency of Overt Act re Seeking Re-employment.*

Again we have an act which assuredly is a commonplace one, i.e., seeking re-employment upon return from a trip. It's also natural to return to the place of prior employment. Again the sinister aspect is revealed when it is shown Herbert was the one member of the gang of saboteurs instructed to return to his old job to obtain secrets of the Norden bomb sight manufactured by the Simpson Optical Company, and to obtain plans of the Plant lay out for incendiary purposes. *He was not merely seeking re-employment. What is more, his father knew it.* The father's accompanying him to the homes of the foremen, participating in the conversation (though not himself asking that his son be re-employed) was helping the son to carry out his instructions. Of course, the son could have sought re-employment alone—but it was not to the Company that he went—he went to the homes of the foremen, in the evening, and it was natural for the innocent outward appearances, that his father and mother go with him. These foremen were acquaintances of the family. The father's presence gave weight to Herbert's application. It also made for better concealment of Herbert's wicked objective.

*Evidence of traitorous intent.* " * * * to make treason the defendant not only must intend the act, but he must *intend* to *betray* his country by means of the act" 325 U.S. 1, 31, 65 S.Ct. 918, 933.

It is on this point that defendant leans heavily—his acts were allegedly those of a devoted father, harboring an erring son, solely because of paternal solicitude. He claims there is no "two witness" direct proof of any contrary possibility.

Again the Cramer opinion must be our guide. It says:

"What is designed in the mind of an accused never is susceptible of proof by direct testimony. If we were *to hold that the disloyal and treacherous intention must be proved by the direct testimony of two witnesses, it would be to hold that it is never provable.*"

Inasmuch as it is obvious that direct proof of a man's thoughts is well-nigh impossible, we rely on his utterances, as well as his acts, for a disclosure of intention. In the instant case the utterances are many, to different persons, at divers times. We have set them forth at length in the margin.[22a] In essence they are this: Hans in June, 1941 said his son liked Germany bet-

---

[22a] *Barbara Kluczyk*, Government Witness.

"Do you recall a conversation with Hans Haupt on any subject about that time? (June, 1941) A. Well, he told us the boy was going to Germany." "Q. For the purpose of refreshing your memory, did Hans Haupt at any time tell you that his son liked Germany better than the United States and wanted to go back and fight for the Germans? A. I think he said that. * * * "

*Carl Eggert*, Government Witness.

"A. Hans told me he wanted to tell me something, that I should go with him in that back room: and I go in there * * Hans Haupt said, 'Carl' he said, 'I got $900 my own money'—You can do me a favor and keep it for me. Then I am afraid now the F. B. I. comes in my home and takes it away.' * * * Well, I said, 'If it is your own money I keep it for you.' * * * I saw Hans Haupt * * * half an hour * * * later in my house. * * (He) Just said again 'Here is $900. * * Please keep it for me.' "

*William H. McDonald*, Government Witness, U. S. Marshal.

Talked to Hans Haupt, August 5, 1942. Hans said he wanted to talk to an F. B. I. agent, and McDonald called them.

*Earl Hirsch*, Government Witness, former F. B. I. Agent.

"I introduced myself to Hans Haupt, showed him the credentials I had, and told him that I understood that he wanted to see an agent of the F. B. I. * * * Hans Haupt said, 'That he told me Wergin and his wife were responsible for his son's condition, that is, being apprehended, but he said he was very mad at them and wanted to testify against them in court. * * * He then said that on Saturday night, July (*sic*, mean June) 20th, that his wife Erna Haupt, himself and Herbert Haupt went over to the Wergin home * * * and at that time in the presence of all present, Herbie Haupt told a complete story of his trip to Mexico. How he contacted the German Consul there and how he obtained passage to Japan, and in Japan they were met by the German and Japanese Consul; thereafter they ran through the British Blockage on a boat and landed in France. Hans Haupt then said Herbie Haupt related that he was in an Intelligence School. * * * and that he had a huge sum of money to use in connection with that over here. Hans Haupt then said Otto Wergin said 'he wasn't a dummy, and that he knew the mission Herbie Haupt was on.' He also said 'He served in a similar capacity during the last World War.' *, * * Hans Haupt then said that Wergin offered his services to Herbie Haupt in his activities in this country, because he could use some of the money Herbie Haupt had. Hans Haupt then related on Friday night, June 19th, he and his wife went over to the Froehling home and while at the Froehling home, Herbie Haupt related (same story) * * and his return to the United States on a German submarine. * * * Wergin and his wife were so insistent on Herbie going forward with these plans, he wanted to testify against him in court.

*Pennel V. Robe*, Government Witness, F. B. I. Agent.

Gives same story as Hirsch, above, including defendant's saying that Herbert told them he went to Germany and returned to this country by submarine. "Herbie Haupt said that his duties in this country was that of a contact man."

*William Max Schroeder*, Government Witness, co-worker of defendant.

"We talked about the time (1936) we were fighting in the war in the trenches; then he brought up about Hitler. * * * He was in back of Hitler. * * * He said he would like to have a man like Hitler here to rule this country. * * * After the meeting he comes to me, told me I should not talk against that, that they send money to Germany. Hans comes to me, told me I should shame myself. * * * "

*Mrs. Louis Fishman*, Government Witness, Employer of Defendant.

"Hans Haupt said that if we entered war against Germany we would have a revolution in this country like they had there after the last war; that we have German

ter than the United States and wanted to go back and fight for the Germans. In June of 1942, Hans gave a friend eighteen fifty dollar bills "of my own money" to keep for him because he was afraid the F. B. I. would come and take it (the F. B. I. took it from the recipient). After defendant was taken into custody *he* asked the marshal if he might speak to the F. B. I. and two agents went to see him. They were Agents Hirsch and Robe. Defendant told them that Wergin was responsible for his son's and his apprehension, and he wanted to testify in the trial against him. Defend-

organizations back here that would take our armories over, our electrical companies, our telephone companies; that the same thing would happen to us as happened in Norway and France, that we would be taken from within by Fifth Column activities."

*John Majerczak*, Government Witness, Convict.

"He says when he seen Herbie (at a relative's home in June, 1942) he was scared; he was scared because the F. B. I. agents and the Selective Service Board * * * and Herbie agreed to go with him * * * and his dad was scared. * * * Herbie, he told me—that Herbie did not * * * could not stay home long, but he wanted to stay home until he got his car; after he got a car he would not stay home at all. * * * Mr. Haupt told us how Herbie came on a submarine to the United States from Germany; that he came with some fellows that landed in Florida; and when they landed in Florida that he went with another fellow to Chicago, * * * He said he was scared of Herbie because Herbie was here for no good reason * * * He said that he told how Herbie told him that he landed with a group of men in a rubber raft—that they changed clothes and hid the explosives * * * in the sand * * * during that conversation he told about money. And later during his conversation he told how his son gave him money in this home, and later his son asked him to purchase an automobile for him * * * he gave him one thousand dollars out of a money belt to buy the car for him. * * * And Mr. Haupt told how he hid this money underneath a rug so that Herbie gave him a sum of money out of a money belt to buy a car. * * * He says Herbie wanted an automobile to get around in, and that he purchased an automobile for him from the money Herbie gave him to purchase this car."

*Carl Hamby*, Government Witness, Convict.

"He said that his son had given him some money. * * * He said it was German money. * * * He said his son left home (1941) and the first time he heard from him was in Mexico, and he said the second time he heard from him he was in Tokyo, Japan; then he did not hear from him for some time then and then he received a letter from his son where he was in Germany. * * * he said Herbie Haupt told him that he came back on a German submarine. He said he did not believe it at first but the son convinced him that he had come back on a German submarine and he explained to Mr. Haupt the purpose, his purpose of coming back to this country, that he came back here to sabotage, to blow up the ammunition dumps, and many factories, * * * obstruct traffic, railroad trains, everything possible, and he named one specific place, the Pressed Steel Company." " 'and he asked me—(Mr. Haupt) I have to come to you to help me. I will need help.' Mr. Haupt told him he would assist him as much as he possibly could. * * * He gave Mr. Haupt some money, a large sum of money and Mr. Haupt took this money and hid it in his home under the rug and Herbie Haupt gave him some other money to hold for him, personal money, and he also gave him money to buy an automobile, and * * *." " * * * after he was * * * graduated from the sabotage school * * * the German government gave him money * * * put them on a submarine and sent them to this country. * * * I asked Mr. Haupt why he did not turn his son in and he said that his son was his own flesh and blood and after all he was helping the fatherland. * * * Mr. Haupt told me that his son wanted a job in the Optical Company; that he was trying to get a job there; that his son wanted some plans which this factory—out of this factory, regarding some kind of a sight, but he was supposed to turn those plans over to Germany * * * Q. Did he say that the boy told him this? A. Yes, sir." "He said that Herbert Haupt talked to him, told him most of these things at their first meeting at Mr. Froehling's home; and he asked if those people, his friends and relatives and his father to help him." Cross-examination, "he said he would cooperate."

*Hans Eric Poppe*, Government Witness.

"He told me (in 1939) that if war would break out with the United States and Germany, he would never permit his boy to join the American Army. He would send him to Mexico and from there he could go to Germany and join the Air Force. He told me at the same time that if war broke out, that if the country would take him in the Army, he would crawl over to the enemy lines and tell them our position."

ant told them the Haupts had gone to the Wergin home on June 20th and Herbert told a complete story of his trip; defendant told them Herbert was in the Intelligence School and "that he had a huge sum of money to use in connection with that over here." Wergin said he wasn't a "dummy," inferring he knew the purpose of Herbert's trip, because he had a similar duty in World War I. Wergin offered to help Herbert because he wanted some of the money.

Defendant told Agent Hirsch, the three Haupts went to the Froehling home on June 19th and Herbert told the same story, and told of coming back on a German submarine. He also told the Agent that on June 27th when Herbert had not shown up all day, the Haupts, Wergins, and Froehlings had a meeting in the Haupt home and decided on a uniform statement they would all make, if apprehended, namely, that they knew nothing of Herbert's activities except that he had been to Mexico. F. B. I. agent Robe testified to the same as Agent Hirsch, adding that defendant said Herbert had said he was to be a "contact man" in this country.

A co-worker of defendant in 1936 stated that Hans told him that he, the witness, was "not a good German" and he "should shame" himself for not contributing to the German cause; he lauded Hitler.

An employer of defendant and his wife testified to conversations wherein defendant said:

"If we entered war against Germany we would have a revolution in this country like they had there after the last war; that we have German organizations back here that would take our armories over, our electrical companies, our telephone companies; that the same thing would happen to us as happened in Norway and France, that we would be taken from within by Fifth Column activities."

He again lauded Hitler and his regime.

Additional overwhelming evidence comes from two convicts who were jail-mates of Haupt in the County Jail after apprehension in 1942. They are Hamby and Majerczak. Defendant told these jail-mates that Herbert had related how he had landed in this country, how they hid the explosives; that Herbert gave him money; that Herbert asked him to purchase an automobile and gave him $1,000 out of the money belt to buy it with; Herbert also gave him thousands of dollars which he hid; defendant told the witnesses he purchased the automobile for the son; he lauded Hitler.

We have not overlooked the warning which appeared in the opinion of the majority of the Supreme Court in the Cramer case, to-wit:

"To use pre-war expressions of opposition to entering a war to convict of treason during the war is a dangerous procedure at best. The same may be said about the inference of disloyal attitude created by showing that he refused to buy bonds and closed the door in the salesman's face. Another class of evidence consists of admissions to agents of the Federal Bureau of Investigation. They are, of course, not 'confessions in open court.' The Government does not contend and could not well contend that admissions made out of court, if otherwise admissible, can supply a deficiency in *proof of the overt act* itself." (Italics ours).

In the instant case the pre-war utterances are not half so damming as the post-war ones. The pre-war utterances show a very strong pro-Nazi adulation. The post-war utterances show a knowledge of Herbert's mission here, and defendant's cooperation to effectuate it.

Defendant stresses the flimsiness of the convicts' testimony. It is admittedly not the weightiest of evidence. If true, it revealed defendant as an indiscreet person. Why should the jury believe it? If defendant had been of good sense, why would he join his son who chose to serve Germany on so important a war mission? Reconciliation of these statements, conclusively established, with ordinary horse sense and good judgment is impossible. Rather it characterizes the action of one who was drunk with Hitler Naziism and aflame with the delusion that he belonged to a superior people whose mission was to conquer the world, and his son was playing a leading role in that conquest. True, outside of an over-weaning self-confidence he had little to support his belief in membership in a superior nation. But the jury was weighing the story of the witnesses and the defendant. The latter was throwing bricks at these witnesses, discrediting them, and pointing to their prison record. Perhaps the jury believed defendant was living in a glass house.

The jury, however, not the court, was the judge of the credibility of all the witnesses.

There is substantiation of the convicts' testimony in the voluntarily-told story by defendant to the F. B. I. agents, when, in vengeance, he sought to ensure the conviction of the person he believed had betrayed his son and himself. The agents' testimony concerned confessions not made in open court, and therefore was not admissible to prove the *overt acts*. They were properly received, however, to prove the intent with which those overt acts were committed.

We quote from the testimony of the witness Hamby.[23]

In the summer of 1939 defendant told a co-worker that he would never permit his boy to join the American Army. He would send him to Mexico and from there he could go to Germany and join the Air Force. He stated, "* * * he told me at the same time that if war broke out, that if the country would take him in the Army, he would crawl over the enemy lines and tell them our position. * * * he told me he had no feeling for the United States at all. His feelings were only for Germany, and he wished Hitler would come over here. * * *."

Reading the evidence, with the care which a treason charge demands, we are left free of all doubt as to the sufficiency of the evidence of criminal intent to support the verdict. It persuasively supports the contention that the overt acts here were done with a knowledge and with an intent to betray this country in time of war, and to aid the enemy, Germany. True, defendant was a scared man (the F. B. I. having investigated the Haupts before Herbert's return), but his heart was still strong for the German cause, even after the declaration of war. He could not refrain from aiding his son in his mission, knowingly and treasonously. The jury could hardly have found other than the defendant was proud his son was a German saboteur, bent on uncovering important war secrets and destroying war plants which were essential to our successful conduct of the war.

Such action by Government counsel in offering all this evidence, we think, would be better commended than criticized.

In a case where criminal intent is so vital in the jury's determination of guilt, as in a treason case, it would seem to be highly desirable that the jury receive all the enlightenment obtainable. In fact, it must occur to a reader of the record before us that defendant would, if innocent, have acted more wisely had he taken the witness stand and explained or denied, if he could make denial, all the damaging testimony of the Government witnesses. Of course, he was not required to take the witness stand. He could, as he did, stand mute, and no unfavorable comment upon such fact could be made to the jury by the prosecutor. Determination of the course to be pursued depends largely on the facts and the state of the evidence produced by the Government. One thing is certain. The Government should not be condemned for offering all the relevant, competent evidence.

Counsel charges duplicity in the indictment and lack of particularity. In general these criticisms were covered in this court's opinion on the former appeal (136 F.2d 661) and decided adversely to the defendant, upon an indictment sufficiently similar to the instant one to make the rul-

---

[23] "Herbert Haupt told him that he came back on a German submarine. He said he did not believe it at first but the son convinced him that he had come back on a German submarine and he explained to Mr. Haupt the purpose, his purpose of coming back to this country, that he came back here to sabotage, to blow up the ammunition dumps, and many factories * * obstruct traffic, * * * everything possible, and he named one specific place, the Pressed Steel Company. * * * and he asked me * * * I have to come to you to help me. I will need help. Mr. Haupt told me he would assist him as much as he possibly could. * * * He gave Mr. Haupt some money, a large sum of money * * * and he also gave him money to buy an automobile, and Mr. Haupt told me that his son told him he did not think it advisable that he should buy an automobile and Mr. Haupt agreed that it was not advisable * * * so Mr. Haupt bought the car himself for Herbert * * * Herbert Haupt told his dad that he needed a car to get around, to do the work that he was supposed to do when he came back to this country. * * * Mr. Haupt told me that his son wanted a job in the Optical Company; * * * that his son wanted some plans which this factory * * * out of this factory, regarding some kind of a sight, but he was supposed to turn those plans over to Germany * * *."

ing there made, here applicable. We adhere to the ruling in that case on this point.

*Sufficiency of the Indictment.* Defendant argues the indictment does not state the crime of treason because the alleged overt acts are legally insufficient. We reject the contention for reasons heretofore given. Suffice it to say that the so-called "commonplace insignificant" overt acts charged when read "in their setting" are neither commonplace nor insignificant.

Error is also assigned because certain "withdrawn" overt acts such as 1, 4, and 8, which charged simply "conferring" with the enemy agent remained physically in the documentary indictment and were taken to the jury room. Evidence had been introduced which showed that such conferences had been in fact held at the various homes of the Froehlings. Wergins and Haupts, so their recital in the overt acts could not have been prejudicial. This evidence was received as a part "of the setting."

It has been generally believed that the prosecutor occupies a position somewhat judicial in character; that he is interested in presenting all the facts, those unfavorable to his case, as well as favorable. He does not perform as a skillful fencer matching wits with an able seaman especially skilled in defensive tactics in criminal cases. In other words, he is charged with the duty to fully disclose and fairly appraise *all* of the facts.

Defendant's criticism is that the prosecutor here held nothing back but disclosed all of defendant's acts and deeds, even though some of them were not established by two witnesses. Such one witness testimony was illuminating and material on the issue of intent rather than as proof of overt acts.

*Denial of Bill of Particulars.* Defendant complains of the denial of a bill of particulars which sought to inform him of the manner in which his accompanying his son to the homes of the former supervisory employers aided the son in securing employment, and in what manner and by what acts he harbored and sheltered his son, and how he aided his son's mission by purchasing a car. A mere statement of these requests shows their insubstantiality. There was no vagueness in the indictment's allegation which needed clarification by particularization—no surprise could be practiced on the defendant in proving the allegations.

*Denial of motion to quash indictment.*

Defendant argues that the trial court erred in refusing to quash the instant indictment inasmuch as the former indictment for treason, conviction under which was reversed by this court and the cause remanded, was still pending.

Neither side has cited authority to support its contention.

An examination of the two indictments makes it clear that they cover the same acts of treason, although the defendants were not the same. Nor were the overt acts. We have no doubt that should the instant conviction stand, an attempted retrial, upon the former indictment, would be subject to a plea of double jeopardy.

Our conclusion is that the grand jury may return several indictments against the accused grounded on the same criminal act.[24] The pendency of an indictment against the accused, where defendant has not been placed in jeopardy upon it does not prevent a later valid indictment against him.[25] Generally speaking, the pendency of a previous indictment is not ground for quashing a second indictment,[26] although it is discretionary with the court to require the Government to elect upon which indictment it will proceed.[27] A few of the cases bearing on the subject are collected in the margin.[28] Especial attention is called to *United States v. Ball,* 163 U.S. 662, 672, 16 S.Ct. 1192, 41 L.Ed. 300.

The practice is not commended in the ordinary case.

---

[24] Thompson v. United States, 9 Cir., 202 F. 401, 47 L.R.A.,N.S., 206; Thompson v. State, 61 Neb. 210, 85 N.W. 62, 87 Am.St.Rep. 453.

[25] Thompson v. United States, supra; Cabaniss v. State, 8 Ga.App. 129, 68 S.E. 849; Hurst v. State, 11 Ga.App. 754, 76 S.E. 78; Dutton v. State, 5 Ind. 533; Peters v. Koepke, 156 Ind. 35, 59 N.E. 33; State v. Lindsay, 86 Vt. 201, 84 A. 612.

[26] 15 Am.Jur. 38 Criminal Law, Sec. 139.

[27] 15 Am.Jur. 38, Criminal Law, Sections 133–135.

[28] United States v. Ball, 163 U.S. 662, 672, 16 S.Ct. 1192, 41 L.Ed. 300; United States v. Neverson, 12 D.C. 152, 1 Mackey 152; Irwin v. State, 117 Ga. 706, 45 S.E. 48; Blyew v. Com., 91 Ky. 200, 15 S.W. 356; Pride v. State, 125 Ga. 750,

*Errors in Admission of Evidence.*

*Prewar Utterances.* Error is charged for admission of pre-war utterances, one of which was made six years prior to the time of the offense, and the others about three or fewer years before. These utterances were strong pro-German statements. They have been detailed above. We believe such utterances were receivable as background evidence bearing on the intent with which the overt acts were committed.

As early as Respublica v. Malin, 1 U.S. 33, 1 Dall. 33, 34, 1 L.Ed. 25, the question of the admissibility of words to enlighten as to motive, was discussed. There the Court said, "But, as it appears that the prisoner was actually with the enemy, at another time, words indicating his intention to join them are proper testimony, to explain the motives upon which that intention was afterwards carried into effect." See also United States v. Pelley, 7 Cir., 132 F.2d 170; United States v. Burr, 25 Fed.Cas. page 55, No. 14,693; American Jurisprudence, Vol. 20, "Evidence," Sec. 340.

Admission of such evidence may be somewhat dangerous, but it may nevertheless be essential. In the instant case the trial court took care to guard the danger of misuse of such testimony by instructions both at the time the testimony was admitted, and at final submission of the case. He admonished the jury that such statements were not a basis for the charge of treason, that defendant had the legal right to freedom of expression. Such statements were to be considered only in determining what defendant's intent may have been after the declaration of war, in committing (if he did) any of the overt acts submitted to them.

Treason can not be committed without treasonous intent, and intent being the subjective fact it is, statements of the accused are of real importance in the proof.

*Evidence re Exhibits.* Complaint is made of the introduction of pictures of the boxes of ammunition which were cached on the beach in Florida, of the saboteurs' caps, Herbert's ring with the Nazi crest, etc., as evidence not connected up with either Herbert or the defendant. The tes-

timony of Burger, a member of the other saboteur party which landed in New York, connected it with Herbert. He had seen the exhibits in Germany when the two expeditions were being outfitted. The testimony of the F. B. I. agents, Connelly and Pryor, also tied it to Herbert.

As against the defendant this evidence was receivable to show the treason to which Herbert was a party. It was necessary for the Government to show treason and *also* that defendant was a party to said treason. This evidence tended to show treason. The burden was on the Government to show (a) a treasonable enterprise and (b), defendant was a party to it. This evidence was part of the proof tending to establish (a). And the crime of treason is not child's play. It's a most serious matter. In all its naked wickedness, it is shocking. To offer evidence that the actors used high power explosives to destroy war industries, to kill large bodies of workers, to obtain war secrets of great value to the enemy, was no doubt highly impressive and persuasive with a jury of loyal American citizens. The complaint of counsel, however, should not be directed to the inadmissibility of such evidence. It should be directed to the action of defendant and his son. As against each of them such evidence would not have been harmful, had Hans and Herbert not been actors playing a leading role in the perpetration of said treason.

*Errors re Instructions.* One instruction complained of (No. 8) charged in substance that the jury was not to find the defendant guilty unless they believed him guilty beyond a reasonable doubt. Defendant contends the constitutional "two witness" requirement of proof should have been inserted. Had there been no precise instruction on the absolute necessity of two witness proof in order to have conviction, there would be more merit in defendant's assignment of error. Each paragraph of an instruction deals with a different aspect of the law and if all the requirements were to be incorporated in each paragraph confusion, not clarity, would result.

We find no error in instruction No. 9 defining "reasonable doubt." It couched in

54 S.E. 688; Gannon v. People, 127 Ill. 507, 21 N.E. 525, 11 Am.St.Rep. 147; 22 Corpus Juris Secundum, Criminal Law, § 241; State v. Messervey, 105 S.C. 254,

89 S.E. 662; United States v. Herbert, 26 Fed.Cas. page 284, No. 15,354, Nash v. State, 73 Ark. 399, 84 S.W. 497.

layman terms the degree of doubt barring conviction.

Instruction No. 13 is said to give a convict's testimony a build-up rather than cautionary. We do not so read this instruction, which states that proof of conviction of a felony is evidence tending to impeach the witness' credibility, but the fact that a witness has been convicted does not mean that he can not tell the truth.

Instruction No. 26 consisted in part of reading some of the indictment, including the reading of overt acts not submitted to the jury, and thereby an unfavorable impression was left with the jury of many extraneous illegal activities of the defendant. The court admonished the jury to consider only the submitted overt acts, and, to consider the evidence adduced in re the unsubmitted overt acts, in the determination of the intent with which defendant did the submitted overt acts. The jury was sufficiently apprised that the indictment was but the pleading. It had to be proven. It was not evidence.

The same answer to the objection to Instruction 36 holds good as to No. 8, above.

Instructions 39, 40, and 41, defining an "overt act" might not stand the test of the definition in the Cramer case as to what constitutes an overt act in the crime of treason, but we can see no prejudicial error therein. The duty of the jury was to determine guilt under the *submitted* overt acts. The court determined the legal sufficiency of all overt acts relied on for conviction. In this case, the overt acts submitted to the jury measured up to the correct definition of a legally sufficient overt act.

Counsel contended that the sentence in Instruction 47, "The Court is submitting to your consideration as possible overt acts of treason, the following alleged acts * * *," is not a neutral statement of submission, but indicates to the jury those acts have been sufficiently proved. We do not so construe that language.

As to instruction No. 49, wherein the trial court charged:

"49. Since the law requires that there shall be no conviction of treason unless there are two direct witnesses to the same overt act, all the other alleged overt acts charged in this indictment are hereby withdrawn from your consideration as overt acts of treason, for even if you believe beyond a reasonable doubt they were performed, they may not in themselves be made the basis of a conviction under the Constitution. However, if you believe beyond a reasonable doubt that the defendant did actually perform any of these other alleged overt acts which were not proven to the degree required by the Constitution, you may consider any such act in determining the question of the intent with which the defendant may have performed, if you find beyond a reasonable doubt he did perform, any of the above alleged overt acts submitted to your consideration and not withdrawn, and which other possible overt acts, not withdrawn, you find from all of the evidence are proven beyond a reasonable doubt by two direct witnesses to the same overt act."

The objection was that it was error to send to the jury the unsubmitted counts, for any purpose, in view of the "two-witness" rule. We have discussed above our interpretation of the Cramer case which specifically states the "two-witness" rule is applicable to the overt act aspect of treason, and not to intent; therefore it was permissible to consider the evidence under the unsubmitted counts if relevant to a determination of intent with which the submitted overt acts were done.

The most seriously argued objection to the charge arises out of instructions 50 and 51. In essence, these instructions told the jury that they were to find the defendant guilty if they found he performed any *one* of the treasonable overt acts submitted, to which acts two witnesses had testified. A plurality of overt acts was submitted. A general verdict was returned. The Cramer case (in footnote 45), 325 U.S. 1, 36, 65 S.Ct. 918, 935, states a general verdict must be set aside "if any of the separable acts submitted was insufficient."

If it were not for the fact that our study of the evidence as summarized above supports the jury's verdict of guilt on *any* or all of the overt acts submitted, reversal would on this theory follow. We have reached the conclusion that each of the overt acts submitted to the jury was legally (or constitutionally) sufficient.

It follows, we think, that if the jury was satisfied by the necessary quantum of proof and by two witnesses, that one or more of the submitted overt acts were proven, the crime was established.

Another phase of this question not argued, tends to support the validity of instructions 50 and 51.

Is the overt act an element of the crime?

In other words, the Constitution specifically defines the crime: "Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort." After the definition of treason is given, there is added a provision as to the quantum of proof necessary to convict: "No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court." It calls for two witnesses to prove one of the acts committed by the defendant in the effectuation of the treason.

The definition of the crime, whether of treason or perjury, where also two witnesses were required, does not include as an element of the crime, the testimony of witnesses whose evidence established the crime so defined. Just as any two witnesses, if believed by a jury, will suffice, so will any one of the legally sufficient overt acts suffice, if proved by two witnesses, provided it is held that said overt act is not an element of the crime.

In the Cramer case the Court said, "The crime of treason consists of two elements: adherence to the enemy; and rendering him aid and comfort." Inferentially this excludes the overt act as an element of the crime.

There seems to be good reason against its inclusion as an element of the crime. If it is an essential element then there would be as many treasons as there are overt acts. As one convicted of treason can give his life but once, there could be but one punishment, if the punishment be death. On the other hand, if acquitted on the first trial, the defendant could be tried times without number. For each overt act, if it be an essential element of the crime, makes for a separate and distinct crime. If the overt act be an essential element of the crime, then each overt act, being different, there would be no limit to the number of treason crimes a defendant could commit in a single day.

On the other hand, consistency appears in the argument that the second sentence of Article III, Section 3, the only one which mentions overt acts, is merely directed to the sufficiency of the proof of treason. It would be more logical to say that one treasonable enterprise exists although numerous overt acts in carrying it out may be shown. Not until one treasonable enterprise was ended, could a second treason begin.

On this theory there could be no criticism of either instruction 50 or 51, for obviously if the treason were committed and *one of several overt acts were established,* a case would be made out.

This view of the crime of treason does not relieve the Government of proving the two elements essential to the crime (a) adhering to the enemy, and (b) rendering the enemy aid and comfort. It is necessary to prove an act or a deed showing the traitor has passed from a state of mind, from the mental, to the doer stage.

Support for this line of reasoning may be found in many cases (Goode v. United States, 159 U.S. 663, 16 S.Ct. 136, 40 L. Ed. 297; Clifton v. United States, 4 How. 242, 11 L.Ed. 957; Powers v. United States, 223 U.S. 303, 32 S.Ct. 281, 56 L. Ed. 448; Dunbar v. United States, 156 U. S. 185, 15 S.Ct. 325, 39 L.Ed. 390; Evans v. United States, 153 U.S. 584, 14 S.Ct. 934, 38 L.Ed. 830; Claassen v. United States, 142 U.S. 140, 12 S.Ct. 169, 35 L.Ed. 966; Coffey v. United States, 116 U.S. 427, 6 S. Ct. 432, 29 L.Ed. 681; Snyder v. United States, 112 U.S. 216, 5 S.Ct. 118, 28 L.Ed. 697) where it is held that one good count in an indictment containing several counts will support conviction where a general verdict has been rendered.

It is, however, not necessary to sustain the judgment that we adopt this construction of the Constitutional provision although it is an inescapable conclusion. For all of the overt acts charged in the cases before us were legally sufficient and there being proof that defendant adhered to the enemy by giving aid and comfort, the crime was committed when and if any *one* legally sufficient overt act was found by the jury to be established.

As to instructions 53 and 54, in regard to intent, defendant complains of the phrase "before you can find the defendant guilty" and the statement, "This does not mean, however, that you must find that the defendant went through any specific mental process as a result of which he was conscious of the specific thought 'I am going to commit treason.'" He cites the Cramer case statement that to

"make treason the defendant not only must intend the act, but he must intend to betray his country by means of the act."

We think the contention is answered by a reading of the whole of the instruction, and by the language of the Cramer case.

"Since intent must be inferred from conduct of some sort, we think it is permissible to draw usual reasonable inferences as to intent from the overt acts. The law of treason, like the law of lesser crimes, assumes every man to intend the natural consequences which one standing in his circumstances and possessing his knowledge would reasonably expect to result from his acts. Proof that a citizen did give aid and comfort to an enemy may well be in the circumstances sufficient evidence that he adhered to that enemy and intended and purposed to strike at his own country."

*Exhaustion of Jury.* The verdict is attacked because the jury deliberated 28 hours without sleep.

The case was one which necessitated extended deliberation by the jury. The trial was a long one and the issues, many. The indictment charged an offense which is the most serious which could be preferred against a citizen. The life of the defendant demanded full and careful consideration of the evidence, and the extended instructions of the trial judge impressively placed a heavy responsibility on each juror. More serious would be the criticism if the said jury had deliberated but a few hours and returned a verdict against the defendant.

The cases are many where the jury remained in deliberations 28 hours or more without sleep. Experience wisely leaves such matters to the discretion of the trial judge. We must reject defendant's argument in this respect. Hyde v. United States, 225 U.S. 347, 383, 32 S.Ct. 793, 56 L.Ed. 1114, Ann.Cas.1914A, 614. Bernal v. United States, 5 Cir., 241 F. 339, 342.

*Illinois Statute on Harboring Member of Family.* Error is assigned because the court refused to admit in evidence the Illinois Statute, Chap. 38, Par. 584, which provides that any person "not standing in the relation of * * * parent * * *" who harbors a felon shall be held as an accessory after the fact, and liable for punishment. Complaint is also made because the court failed to instruct as to this statute.

There was no error in the court's action. Treason is a Federal offense. A state criminal statute can not exculpate a violator of the Federal criminal law. As a matter of fact, a parent merely harboring a son would not be guilty under the Federal treason statute. He must possess a treasonous intent—an intent to betray his country by means of the act. The District Court so instructed the jury.

Numerous other assignments of error * have been urged which we have duly and carefully considered. We think a separate, extended discussion of each one is unnecessary and unjustifiable. We do not find merit in any one of them. Each and every one has been considered and is rejected either because it is not well taken or because the charge is unsubstantiated by the record.

The judgment is

Affirmed.

KERNER, Circuit Judge (concurring).

I concur in affirming the judgment, but not in all that is said in the opinion.

MAJOR, Circuit Judge (dissenting).

"But the basic law of treason in this country was framed by men who, as we have seen, were taught by experience and by history to fear abuse of the treason charge almost as much as they feared treason itself." Cramer v. United States, 325 U.S. 1, 21, 65 S.Ct. 918, 928. Acting on such fear, treason was deliberately made a difficult crime to prove by providing in the Constitution: "No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court." The opinion by which this judgment is to be affirmed is a striking illustration that the fear entertained by the makers of the Constitution was well founded. The reasoning of the opinion is, in my judgment, so grievously and palpably erroneous that I find myself compelled to dissent. The opinion states that it is "unfortunate that the trial occurred before the decision in

---

* Rejection of tendered instructions, rejection of evidence of Illinois statute, inflammatory argument of counsel, exhaustive period of deliberation of jury, reading of witnesses' testimony to jury after commencement of deliberations, verdict and sentence.

Cramer *v.* United States." Presumably this means that the trial court would have tried the case on a different theory if it had had the benefit of that decision. I doubt not that such would have been the case. In this connection, it can be said with equal propriety that it is even more unfortunate that the majority of this court in their zeal to affirm this conviction have been faced with the law of treason as announced in that decision.

Defendant was entitled to have the question of his guilt determined by a jury in accordance with the law and the Constitution pertaining to treason. As I view the matter, the function of this court is confined solely to the question as to whether his guilt was thus determined. If not, the judgment should be reversed, irrespective of any personal opinion we may entertain on that issue. Any other view amounts to usurpation of the province of the trial court and the jury. If this view be correct, the conclusion to affirm receives little, if any, support from the voluminous recitals of the opinion designed to show that the defendant is guilty.

I shall therefore overlook numerous erroneous statements and innuendoes found in the opinion and come at once to a consideration of certain legal questions with which I take issue and which, in my judgment, require a reversal. These legal questions no doubt arise in the main from the fact that the case was tried and a conviction obtained upon a theory diametrically opposed to that on which the government seeks an affirmance in this court. The case was tried and the jury was instructed (instructions will be hereinafter discussed) on the theory that proof of one or more overt acts by the direct testimony of two witnesses was sufficient to authorize a conviction. In seeking an affirmance in this court, it is conceded by the government that such is not the law and that a reversal is required if there was a failure of proof as to any one of the overt acts submitted. While it is difficult to be certain on what theory the judgment is affirmed due to the inconsistent conclusions which are reached, it is my understanding that the majority embrace and affirm on each of these incompatible theories.

I shall therefore first show the theory upon which the case was presented to this court and later that upon which it was tried. Twelve overt acts were submitted to the jury. The judgment rests upon the jury's general verdict of guilty. No position was taken by the government in its original brief as to whether the judgment could be sustained in the event this court concluded there was a failure of proof as to one or more of such acts. During oral argument an inquiry was specifically directed to government counsel concerning such an eventuality and leave was granted to the parties to file a supplemental brief directed solely to this question, which brief was filed by the government October 26, 1945. In order to dissipate some of the fog created by the opinion, I quote from this supplemental brief:

"During the oral arguments in the above-entitled cause our attention was directed to the question of whether or not, if any of the overt acts, either as alleged or proven, submitted to the jury as possible overt acts upon which it could base a conviction for treason, were insufficient, it would be necessary for the court to reverse the conviction. We have therefore addressed ourselves to that problem, keeping in mind Instruction No. 51 (Bill of Exceptions 1591), by which instruction the jury were told:

" 'It is not necessary for the Government to prove by two witnesses the performance of more than one of the submitted overt acts, providing, of course, the other elements of the alleged crime are proven beyond a reasonable doubt as heretofore defined in these instructions.'

"It would seem from a review of the authorities, including Cramer v. United States, 325 U.S. 1, 65 S.Ct. 918, 935, 89 L.Ed. ——, footnote 45; Stromberg v. California, 283 U.S. 359, 368, 51 S.Ct. 532, 75 L.Ed. 1117, 73 A.L.R. 1484; Williams v. North Carolina, 317 U.S. 287, 292, 63 S.Ct. 207, 87 L.Ed. 279, 143 A.L.R. 1273; and Roth v. Swanson, 8 Cir., 145 F.2d 262, 269, that the failure to prove or the insufficiency of any of the submitted overt acts would require a reversal of the conviction."

Certainly there can be no doubt but that the government after due deliberation with honesty and frankness conceded that a failure of proof as to one or more of the overt acts submitted would require a reversal. In fairness to the government, it should be stated that it was also urgently insisted, as had been done in the original brief, that all of the submitted acts were properly proven. Furthermore, as I un-

derstand, it was and is the government's contention that instruction 51, which embodies the theory on which the case was tried in the court below, was not prejudicial error because all of the submitted acts were adequately proven.

That the opinion recognizes the government's concession as sound and as the law of the case is also clear. The opinion states:

"Concededly there must be *direct* proof, by *two* witnesses, to *each* overt act, submitted to a jury, upon whose general verdict the sentence in a treason case is pronounced. There may be overt acts of legal sufficiency and established by the direct testimony of two witnesses, but the conviction will fall if the court submitted to the jury certain alleged overt acts which were charged in the indictment but which were either legally insufficient or not sufficiently established to present a jury question, by the direct testimony of two witnesses."

Also:

"The law being as announced in the *Cramer* case, it is our duty to carefully examine the long record here involved and determine if the requisite constitutional measure of proof was adduced by the Government. In performing this task, we have, as we read the respective witnesses' testimony, recorded the evidence relevant to any submitted overt act, to the said overt act to which it appertains. Because of the indispensability of such proof on one theory which has been advanced by government counsel, as to each overt act submitted we set forth such evidence and overt acts seriatim."

At this point I challenge the statement, "on one theory which has been advanced by government counsel." This at least implies that the government presented to this court both of these inconsistent theories as grounds for affirmance. Such is not the case. This double-headed monstrosity was conceived in this court and not in the mind of government counsel.

At another point the opinion points out that the prosecution might have withdrawn several of the alleged overt acts charged in the indictment and made its conviction less vulnerable to attack. Unless the author of the opinion thought that proof of all the overt acts was required, how can it be said that a withdrawal of some of the acts would have made the

government's position less vulnerable to attack? Also, the theory on which the case was tried did not require the exercise of such judgment on the part of either counsel for the government or the trial court. By that theory it was sufficient if only one of the overt acts submitted was properly proven.

Furthermore, the opinion sets forth each of the twelve overt acts and relates, in detail all of the evidence found in the record, which it is thought proves each. If an affirmance of this judgment is to be had on the theory here advanced by the government, this would seem essential. If, on the other hand, the judgment is to be affirmed upon the theory on which the case was tried, the setting forth of this voluminous testimony is an idle and useless gesture.

True, the author of the opinion appears to have been in some doubt as to the purpose of reciting all of the submitted overt acts, together with the proof relied on in support of each. Prior to so doing, the opinion states that it.is for the purpose of determining "if the requisite constitutional measure of proof was adduced by the Government." After consuming some eighteen pages in detailing this testimony, it evidently was discovered that it was for some other purpose. The opinion states:

"It would seem inexcusable to set forth the lengthy statement of witnesses which supports or tends to support the numerous so-called overt acts. We feel like apologizing therefor. *Yet, on the theory advanced by the defendant's counsel we have found no way to avoid it.*" (Italics supplied.)

Whether the narration of this voluminous testimony was for the purpose of sustaining the government's theory, as stated at one point in the opinion, or whether it was for the purpose of disproving the defendant's theory, as stated at another point in the opinion, is really unimportant. The main point is that the effort was without purpose except in recognition that an affirmance could be had only upon adequate proof that each of the submitted overt acts had been proven.

Having shown that the majority (up to this point) proceed on the theory that the judgment can be sustained only by the direct testimony of two witnesses to each of the submitted overt acts, I now reach the first major premise with which I take is-

sue. For the purpose of such issue, I am willing to assume that the overt acts as alleged are legally sufficient, as the majority have found. In other words, if that were the only question involved, I would not dissent, notwithstanding the dubious propriety of such a holding in view of the Cramer case. Especially is this so as to the acts which charge that Herbert Haupt was harbored and sheltered in the home of his father (and mother). No claim is made and there is no proof that he was concealed in this home; on the other hand, the testimony indicates that he entered and departed therefrom the same as any son might be expected to do. There is proof that he was on one occasion furnished food to eat and a bed in which to sleep. Just how the action of his parents in this respect was of any assistance to the government of Germany or any harm to the United States is not easy to discern. I suppose in order to have escaped a charge of treason it would have been incumbent upon the parents to have slammed the door to their home in his face. Even this would not have been sufficient under the reasoning of the majority if perchance they had given him a sandwich to eat as he made his departure.

The opinion on its face, however, is so clearly wrong in its conclusion that all the submitted acts were properly proven that I pass to that question. As the opinion concedes, on this phase of the case a reversal is required if one or more of the acts are without sufficient support. I shall therefore direct my discussion only to acts 12, 17, 20, 21, 22 and 23, the so-called harboring acts. These acts are all in substantially the same phraseology except that each designates a different date. They each charge that on a certain date the defendant "harbored and sheltered the said enemy Herbert Haupt at the home of Hans Max Haupt, 2234 N. Fremont Street, Chicago, Illinois." The dates alleged are: in overt act 12, June 22, 1942, in overt act 17, June 23, 1942, and in overt acts 20 to 23, inclusive, June 24 to June 27, 1942, inclusive. As heretofore stated, the majority opinion sets forth in detail the proof held to supply the requisite support for each act. For the purpose of my position, I think it may be safely assumed that the record has been carefully searched and all the testimony offered in support of each act properly and fully set forth.

At this point it is pertinent to observe that the entrance to 2234 N. Fremont Street, set forth in each of these acts and oftentimes referred to by the witnesses, is not the entrance to the apartment occupied by the Haupts but is the entrance to a 3-story apartment building, and that the home of the Haupts was the third floor apartment reached by a stairway which extended from the entrance of the apartment building to and by each of the other apartments, that is, one located on the first and the other on the second floor.[1] In considering the testimony relied upon by the majority in support of these various overt acts, it should also be kept in mind that they are each separate and distinct, and in accordance with the constitutional mandate must be proven by "the testimony of two witnesses *to the same overt act* or on confession in open court."

"Every act, movement, deed, and word of the defendant charged *to constitute* treason must be supported by the testimony of two witnesses." Cramer v. United States, supra, 325 U.S. at page 34, 65 S.Ct. at page 934. More than that: "The case of treason stands upon a peculiar ground; there, the *overt* acts must, by statute, be specially laid in the indictment, and must be proved as laid. The very act, and mode of the act, must, therefore, be laid as it is intended to be proved." United States v. Gooding, 12 Wheat. 460, 474, 25 U.S. 460, 474, 6 L.Ed. 693.

It would serve no useful purpose and would unduly prolong this discussion to point out the insufficiency of the proof as to each of these harboring overt acts. The evidence speaks for itself. I assert with confidence that the only one which is possibly supported by the direct testimony of two witnesses is act 17. As to that act, there is the testimony of two witnesses who were in the Haupt apartment and testified that Herbert Haupt was there with his parents. I suppose that proof of his presence in the apartment would constitute proof that he was harbored. As to the other five harboring acts, there is no direct proof. The evidence relied upon is entirely circumstantial. I call particular attention to overt act 23, which charges

---

[1] Actually, this 3-story apartment building contains six apartments, three in the rear and three in the front, and each set of apartments is reached by a separate stairway.

the defendant with harboring on June 27, 1942. The proof in support of this act is on its face glaringly insufficient.

As will be noted, the five witnesses whose testimony is relied upon by the majority in support of this act are all F. B. I. agents. Every word uttered by these witnesses which proved or tended to prove that Herbert Haupt was in the home of the defendant (the third floor apartment) on June 27, 1942 is purely circumstantial. There is not a word of direct proof in support thereof. More than that, it should not be overlooked that Hans Max Haupt and not Herbert Haupt is the defendant in this case, and there is not a scintilla of testimony, either direct or circumstantial, that the former was either in or about the apartment on this date. In fact, his name is not even mentioned by the witnesses. Just how the defendant was shown, by the direct testimony of two witnesses, to have committed this act, without even a mention of his name, is one of the several imponderabilities presented by the majority opinion.

The proof concerning overt act 12 is likewise wholly deficient insofar as it pertains to this defendant. There is no proof either direct or circumstantial that this defendant was in or about his apartment on June 22, the date alleged. As the proof related in the majority opinion in support of this act shows, three of the government witnesses testified that Herbert Haupt, together with his parents, made a short visit with the people who lived in the first floor apartment. Three F. B. I. agents testified to seeing Herbert Haupt and his parents enter the apartment building. One of these agents stated that on one occasion he saw Mrs. Haupt and Herbert enter the apartment building and shortly thereafter the lights in the Haupt apartment were extinguished. The proof relied upon in support of the other harboring acts (except act 17) is purely circumstantial, as a reading thereof will disclose.

It is easy to perceive the great difficulty experienced by the majority in bridging the gulf with which they were confronted by the holding in the Cramer case that an overt act could not be supported merely by circumstantial evidence but that it required, as a minimum, the direct testimony of two witnesses. It was essential, however, that the gulf be bridged if an affirmance was to be had. At this point it appears my brethren were on the verge of repudiating the direct testimony rule of the Cramer case. The opinion states:

"It is worthy of passing note that it is the decision in the Cramer case, not the definition found in the Constitution, which adds the necessity of '*direct* evidence.'"

This insinuation directed at the Cramer decision overlooks the fact that the dissenting opinion in that case takes no issue with this rule pronounced by the majority; in fact, the dissent by inference approves of it.

Moreover, the court in the Cramer case is not the first which has held that an overt act must be supported by the direct testimony of two witnesses. Judge Learned Hand (then a District Judge) in United States v. Robinson, D.C., 259 F. 685, so held. On page 694 of 259 F., he states:

"I conclude, therefore, that it is necessary to produce two direct witnesses to the whole overt act."

He points out:

"* * * the case rested upon circumstantial evidence, which, while well-nigh conclusive in fact, was not direct as required. There seems to me no question whatever that without disregarding the whole theory of the Constitution I could not allow a verdict to stand if I received it. I must therefore direct it for the defendant."

Furthermore, it is difficult to think that any court could hold otherwise. To say that the two witness rule can be met by circumstantial evidence is to render meaningless the constitutional requirement. The strength of circumstantial evidence does not depend upon the number of witnesses. One such witness might make a strong case or, on the other hand, a dozen such witnesses might prove little or nothing. Therefore, reasoned on any rational basis, the precise act as alleged must be supported by the direct testimony of two witnesses.

Notwithstanding the insinuation that the direct evidence rule of the Cramer decision was wrong, the opinion proclaims, "We must, however, and do follow the court holding." This profession, however, is of little consequence in view of what follows. In summarizing the proof concerning these overt acts, the opinion states:

"As to several of these days (acts) there was simply the testimony of F.B.I. agents that they saw the saboteur, Herbert, and

his father leaving and going into the front entrance of the six-apartment building wherein the Haupts lived."

Then follows this remarkable pronouncement:

"In our opinion the testimony of persons who saw the son enter the front entrance which led to the front three apartments of the six apartment building, on the third floor of which the defendant-father lived, saw lights either.go on or off in the third floor apartment soon after entry of the persons, saw the son emerge in different garments than that in which he entered that same entrance some time before; saw the son leave *many hours* after having entered—is *direct* testimony that said son was being quartered in the father's home."

It will at once be noted that the majority completely ignore the law which requires that each overt act must be proved as laid. Instead they combine a number of circumstances, some shown with reference to one act and some another, and conclude that these circumstances are *"direct* testimony that said son was being quartered in the father's home." Still more remarkable, however, is the fact that the majority are willing to hold that these circumstances in their combined form are direct proof. If such be' the case, there is no longer any such thing as circumstantial evidence and all the court opinions and text books which have distinguished between direct and circumstantial proof might well be destroyed. It is another illustration of the length to which my brethren are willing to go in order to affirm this conviction.

So at this point we have an unmistakable holding by the majority consistent with the government's theory before this court that failure of proof by the direct testimony of two witnesses as to any of the overt acts submitted would require a reversal. With this proposition of law I agree. The majority escape the duty to reverse only by holding, erroneously I think, that all of the acts submitted were sufficiently supported. The majority, however, in escaping from one dilemma find themselves confronted with another, and that is the theory on which the conviction was obtained. Such theory is embodied in instructions 50 and 51. Instruction 50 authorized a conviction if "Hans Max Haupt with treasonable intent per-

formed any of the above alleged overt acts submitted to your consideration and that two direct witnesses have testified to such act." Instruction 51 (heretofore set forth in the quotation from the government's supplemental brief) is of like effect.

Referring to instructions 50 and 51, the opinion correctly states:

."In essence, these instructions told the jury that they were to find the defendant guilty if they found he performed any *one* of the treasonable overt acts submitted, to which acts two witnesses had testified." Then follows the statement:

"If it were not for the fact that our study of the evidence as summarized above supports the jury's verdict of guilt on *any* or all of the overt acts submitted, reversal would on this theory follow."

I confess my inability to comprehend this statement. " * * * reversal would on this theory follow." What theory? The one on which the case was tried or the one on which it was here submitted?

It appears, however, that this is the first step in the process by which the majority are to shift their position. This they must do when faced with the dilemma presented by the instructions. The second step by which the shifting process was completed is immediately disclosed by the following statement:

"It follows, we think, that if the jury was satisfied by the necessary quantum of proof and by two witnesses, that one or more of the submitted overt acts were proven, the crime was established."

If there be any doubt that their position has shifted, compare the conclusion just quoted with the following pronouncement previously made:

"There may be overt acts of legal sufficiency and established by the direct testimony of two witnesses, but the conviction will fall if the court submitted to the jury certain alleged overt acts which were charged in the indictment but which were either legally insufficient or not sufficiently established to present a jury question by the direct testimony of two witnesses."

Thus, instructions 50 and 51 are held to state properly the law of the case, notwithstanding the government's concession that the "failure to prove * * * any of the submitted overt acts would require a reversal of conviction," notwithstanding

that the majority have heretofore held the concession made by the government to be the law of the case, and notwithstanding the fact that the opinion devotes some eighteen pages in an effort to show that each of the overt acts submitted was supported by the direct testimony of two witnesses. The ability of my brethren to so abruptly and dexterously change horses is amazing. It seems to me that any kind of consistency would have required that this charge be held erroneous.

Without any apparent relevancy, it is also reasoned in support of these instructions that an overt act is not an element of the crime of treason. This is another illustration of the confused state of mind which has seized my brethren in the consideration of this case. It appears that the majority are of the view that an overt act need not be even alleged. It further appears from the argument on this point that they have decided that which is previously intimated, that is, the Cramer decision is bad law. As I read the Cramer decision, no single principle relative to the law of treason is so thoroughly established as that an overt act is an essential element of the crime. The majority so hold, at least by plain implication, and the minority so hold by direct statement. In the opinion of the former (page 29 of 325 U.S., page 932 of 65 S.Ct.), it is stated: "* * * but so long as he commits no act of aid and comfort to the enemy, there is no treason." In a footnote to the dissenting opinion (page 54 of 325 U.S., page 943 of 65 S.Ct.), it is stated: "It is well established that the overt act and the intent are separate and distinct elements of the crime of treason under the Constitution." (Citing many cases.) More than that, as the Supreme Court held in United States v. Gooding, supra, the overt acts must be specifically laid in the indictment and must be proved as laid.

I agree with the government's theory that all of the overt acts submitted to the jury must be proven as laid in the indictment. It follows from this that the court's charge to the jury was fatally defective. As I have pointed out, there was a failure of proof by the direct testimony of two witnesses as to some of the acts submitted. Furthermore, even though all of the acts had been properly proven, as the majority have held, a reversal would still be required because of the erroneous instructions. An affirmance under such a situa-

tion means that the defendant has had a trial by this court on the acts submitted but not a trial by jury. While I have stated I agree with the government's theory that all of the overt acts must be properly proven as laid, I also think that the only possible theory on which this judgment could be affirmed with any degree of consistency and without repudiating the express language of the Supreme Court would be by a forthright holding that the instructions properly stated the law of the case. The door to such a holding has been almost but not entirely closed by the Supreme Court. In the Cramer case 325 U.S. footnote page 36, 65 S.Ct. at page 935, the court held: "* * * the verdict must be set aside if any of the separable acts submitted was insufficient." Cited in support of this statement is Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117, 73 A.L.R. 1484. The court in that case (page 367 of 283 U.S., page 535 of 51 S.Ct., 75 L.Ed. 1117, 73 A. L.R. 1484) stated:

"The verdict against the appellant was a general one. It did not specify the ground upon which it rested. As there were three purposes set forth in the statute, and the jury was instructed that their verdict might be given with respect to any one of them, independently considered, it is impossible to say under which clause of the statute the conviction was obtained."

Thus it appears that in both the Cramer and Stromberg cases the court was referring to an act or charge without legal force. Although the question may not be free from all doubt, I am of the view that the same reasoning must apply in a treason case where the quantum of proof as to each overt act is prescribed by the Constitution. It is this fact which distinguishes treason from all other crimes. Such being the case, I am unable to differentiate between a situation wherein one of the acts submitted is legally insufficient and a situation wherein there is a failure as to one of the acts to meet the requirements of the Constitution in respect to proof. I am unable to believe but that a general verdict in one instance would be subject to the same deficiency as in the other. In either instance, the defendant would be deprived of a constitutional right.

The one certain thing about the opinion is that the judgment is at all hazards to be affirmed, because the majority think

the defendant is guilty. In order to reach this goal, the opinion holds that all of the submitted overt acts must be proven by the direct testimony of two witnesses and that a failure of proof as to any one or more overt acts would require a reversal. It then holds that the court properly instructed the jury that it was authorized to convict the defendant if one or more of the submitted overt acts had been proven by the direct testimony of two witnesses. In order to sustain the conviction on the former theory, it was held that all of the submitted overt acts had been properly proven by the direct testimony of two witnesses. In doing so, however, the opinion treats and holds as direct proof that which is purely circumstantial. In sustaining the court's instructions to the jury, the theory on which the case was presented to this court, including the express concession of government's counsel, has been repudiated. I am unable to join in a result brought about by such inconsistent and illogical reasoning. In my opinion, the constitutional provision on treason has been nullified and the decision of the Supreme Court in the Cramer case (both the majority and minority opinions) emasculated. This is so, notwithstanding that the opinion is replete with numerous protestations to the contrary.

I would reverse the judgment.

### On Petition for Rehearing.

**PER CURIAM.**

Petition for rehearing denied.

MAJOR, Circuit Judge (dissenting).

Ordinarily, there is no occasion for a dissenter to analyze an answer to a petition for rehearing. In the instant case, however, the government has so completely demonstrated the fallacy of its position that some further comment seems to be in order. The government asserts that the writer of the dissenting opinion has misconceived the situation. The writer admits that such a characterization of him is often in order. In the instant case, however, 'I think it can be demonstrated by their own words that it is the learned counsel for the government who have not only misconceived the situation but have exposed their failure to grasp the fundamental issues of the case. As a famous American was prone to say, "Let's look at the record."

I only desire to examine the government's present position as stated in its answer to the petition for rehearing concerning that which I have heretofore labeled as the two theories, inconsistent in their nature, upon which the judgment is to be affirmed. All through the government's most recent exposition runs the basic fallacy epitomized in the last paragraph of its answer. "Instructions No. 50 and No. 51 have a most solid basis in the law, the Constitution itself, which states, 'There shall be no conviction of treason unless on the testimony of two witnesses *to the same overt act.*' It will be noted that the word used is 'act' and not 'acts.' There is no authority whatsoever for the contention that more than one overt act must be proven to convict of the crime of treason."

Of course, as an abstract proposition that is the law, with which I doubt any member of the Bench or Bar would take issue. The fact is, however, that it is entirely beside the point and wholly irrelevant to any issue in this case. This abstract proposition would be pertinent in a case where only one overt act was submitted to the jury. Here, however, twelve of such acts were submitted and the question is whether under such circumstances proper proof of one act is sufficient to authorize a conviction or whether all of the submitted acts must be properly proven.

The answer states: "It is apparently his belief (Judge Major's) that the Government tried its case in the lower court upon the theory that there was no necessity for having all of the submitted overt acts * * * proven by two witnesses, as long as there was one adequately proven treasonable act." The answer then asserts: "That this belief never existed in the mind of Government counsel * * *." How this disclaimer can be advanced, in view of the fact that the jury was authorized by the court's instructions to convict if one act had been sufficiently proven, is beyond my comprehension. Not only did I think that the government tried its case on the theory stated, but the majority must also have thought so. The opinion aptly states: "In essence, these instructions told the jury that they were to find the defendant guilty if they found he performed any one of the treasonable overt acts submitted, to which acts two witnesses had testified."

In the interim between the trial of the case and its presentation to this court, the

Cramer decision was rendered by the Supreme Court. Cramer v. United States, 325 U.S. 1, 65 S.Ct. 918. By that decision a serious question was raised as to the validity of the theory embodied in the court's instructions. Government's counsel, after mature deliberation, in a supplemental brief stated its position as follows: "It would seem from a review of the authorities, including Cramer v. United States (also citing other cases), that the failure to prove * * * any of the submitted overt acts would require a reversal of the conviction." In other words, it was the government's position that proof of all the overt acts was required and that the failure to prove any of such acts would (not might, as asserted in the answer) require a reversal.

So, surely there can be no doubt but that the case was tried and submitted to the jury on the theory that sufficient proof as to one of the submitted overt acts would sustain a judgment of conviction and that it was presented to this court on the theory that proof of all the submitted overt acts was required.

Notwithstanding that these two diametrically opposed and inconsistent theories have been advanced by the government, one in the trial court and the other in this court, the government in its answer boldly asserts: "At no time has the Government adopted two theories of this case. At all times it has consistently advanced but one theory. This theory was advanced to the trial of this case and adhered to throughout all proceedings of this cause on appeal." [1]

The following paragraph in the answer demonstrates not only the confusion attending the labor of government's counsel but it reaches heights of inconsistency rarely found in a legal document: "We also affirm the correctness of Instructions 50 and 51 which as Judge Evans states told the jury that they were to find the defendant guilty if they found he performed any one of the treasonable overt acts submitted to which two witnesses had testified. As long as each of the submitted acts were attested to by two witnesses and were sufficient as acts of treason the instruction is perfectly correct. That was our belief in

the trial court and that is our belief now." Assuming that the word "attested" in the second sentence of this paragraph means proven, then the paragraph as a whole carries the inescapable and absurd meaning that the jury could convict upon proper proof of one act, providing it was also determined, in some unknown manner and by some undisclosed authority, that the other eleven acts were also proven in the manner required by the Constitution.

The answer also states: "So that there be no misunderstanding we emphatically state that we believe it to be a correct principle of law that proof of one or more overt acts by the direct testimony of two witnesses is sufficient to authorize a conviction for treason." The answer then proceeds to contradict this statement. Referring to the concession made in the government's supplemental brief, the answer states: "We stated, in substance, only that there must be direct proof by two witnesses to each treasonable overt act submitted to the jury * * *. It was our belief that in the light of those instructions * * * and in the light of the general verdict the submission of a * * * unproven act might (in the brief it was the word "would" and not "might") require a reversal by the court." I admit my inability to follow a contention so patently preposterous. By these two statements we are told that it is the government's position that proof of one of the submitted overt acts by the direct testimony of two witnesses is sufficient, but that unless all of the submitted overt acts are proven by the direct testimony of two witnesses a reversal is required.

I do not withdraw from the view that the government tried the case on one theory and presented it to this court on another. The record and the answer filed to the petition for rehearing make that conclusion inescapable. The law on this feature of the case either is that proper proof of one act is sufficient or that proper proof must be made as to all of the submitted acts. There can be no middle ground.

If the law requires proper proof as to all the submitted overt acts, as I think it does and as the government conceded in

---

[1] If this assertion be correct, it is pertinent to observe, even though of minor importance, that it stamps government's counsel as men of tremendous prophetic vision. They must have anticipated the holding of the Supreme Court in the Cramer case; otherwise, that decision alone would have necessitated a shifting of position. As already pointed out, government's counsel so recognized in its supplemental brief filed in this court.

this court, a reversal is required even though all of such submitted overt acts have been properly proven. (As originally shown, I disagree with the conclusion of the majority that all of the submitted overt acts were properly proven.) This is so for the reason that the case was tried and submitted to the jury on the theory that proper proof of one act was sufficient to authorize a conviction. If proper proof of all the acts is required, then the theory on which the case was submitted to the jury is erroneous, and prejudicially so.

I would allow the petition for rehearing and reverse the judgment.